UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                         x

In re:                             x

       JJ ARCH LLC,                 x   Chapter 11

                              x   Case No. 24-10381 (JPM)

                              x

                Debtor.[1]      x

------------------------------------------------------------------ x
                         x

JJ ARCH LLC,                     x

                *Plaintiff,*      x

                              x   Adv. Pro. No. _____

     -against-                 x

                              x

608941 NJ INC.; Jared Chassen; Arch Real Estate  x
Holdings LLC; Infinity Real Estate LLC; and Michelle  x
Miller,                                  x

                *Defendants.*     x

------------------------------------------------------------------ x

## VERIFIED COMPLAINT

Plaintiff JJ ARCH LLC (the "Debtor") hereby files the following Complaint against 608941 NJ INC. ("Oak");[2] Jared Chassen ("Mr. Chassen"); Arch Real Estate Holdings LLC ("AREH"); Infinity Real Estate LLC ("Infinity"); and Michelle Miller ("Ms. Miller"), and in support thereof state and allege as follows:

## NATURE OF THE ACTION

1.      Since taking temporary control of AREH pursuant to an order of the State Court (as defined below), Oak, working together with Mr. Chassen,[3] have allowed chaos to reign

---

[1]     The last four digits of the Debtor's federal tax identification number are 4251.
[2]     608941 NJ Inc. is a subsidiary of 35 Oak Holdings Ltd. ("35 Oak").
[3]     And together with Infinity, with respect to the Alton transaction, as discussed below.

at the Arch Companies by either completely ignoring, or trampling over, the contractual consent rights of the Debtor and the Debtor's non-debtor affiliates, all in a concerted effort to relieve Oak of hundreds of millions of dollars in property loan guarantee obligations related to numerous Arch property investments (the "Investment Properties").[4]

2.      Pursuant to this Complaint, the Debtor asks the Court to compel Oak, Mr. Chassen, and Infinity to: (i) cease taking actions not in compliance with the Consent Provisions (as defined below) of the Operating Agreements (as defined below), and (ii) undo any transactions taken without proper consent. To the extent any transactions have been taken in violation of the Consent Provisions that cannot be undone, the Debtor seeks an award of compensatory damages from the Defendants.

3.      The Debtor's interests and consent rights in the Investment Properties are valuable assets of this Debtor's estate which the Defendants have sought to violate, usurp, or to blatantly ignore for their own financial gain.

## THE PARTIES

4.      Plaintiff Debtor is a real estate holding and operating company formed under the laws of New York in December of 2017.[5] Mr. Jeffrey Simpson ("Mr. Simpson") is the Debtor's managing member and owns 100% of the interests in the Debtor. The Debtor serves as the managing member and Class B member of Arch Real Property Holdings I ("ARPH I").

5.      Defendant Jared Chassen is the Debtor's former non-controlling member and a participating investor in ARPH I.

6.      Defendant Oak is a corporation organized and existing under the laws of the

---

[4]    The Investment Entities and the related Investment Property are listed on Schedule A hereto.
[5]    As noted in its recently filed Chapter 11 Plan [Dkt. No. 184], the filing of the Debtor's liquidating plan triggered the dissolution of the Debtor pursuant to Section 9.1 of the Debtor's operating agreement.

State of New Jersey with a principal place of business in Toronto, Canada. Its principals are Kevin Wiener, William Weiner, and Michael Wiener. It is the Class A member of ARPH I.

7.    Defendant AREH was formed under the New York limited liability company law in 2017.[6]

8.    Defendant Infinity is a Delaware limited liability company.

9.    Defendant Ms. Miller is a former key employee of the Arch Companies and a Class C Member of ARPH I.

## JURISDICTION AND VENUE

10.    The Debtor filed its chapter case on March 7, 2024 (the "Petition Date").

11.    The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

12.    Venue is appropriate in this Court pursuant to 28 U.S.C. §§1408 and 1409.

13.    This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

## BACKGROUND

### A.  The Arch Companies' Complex Structure

14.    At its peak, the Arch Companies managed and/or controlled in excess of $1 billion of real estate across the United States, which, at one time, included 5.7 million of square footage and fifteen (15) active investments in seven (7) states, and employed more than one hundred (100) people through six (6) affiliate companies.

15.    The Arch Companies are composed of numerous affiliated operating and investment entities in complex structures, with approximately one hundred twenty-five (125)

---

[6]    AREH, the non-member manager, generally does not own physical assets and is instead responsible for the Arch Companies' overall operating businesses direction, including serving as the asset and investment manager for the Investment Entities, with few exceptions. Pursuant to the State Court Proceeding (as defined below), Oak temporarily serves as AREH's sole managing member.

3

investors who have invested over $100 million (the "Non-Oak Investors").[7]

16.    The Debtor[8] was established as the ultimate parent company of the Arch Companies and controlled, through AREH[9] and a series of other non-debtor subsidiaries, the Investment Properties.

17.    AREH is not the owner of the Investment Properties. Rather, ownership and control of the various Investment Properties were each structured in a similar fashion, with each Investment Property owned by a distinct corporate entity with several investment tranches (the "Property Owner")[10] that was, in turn, controlled by an intermediary managing member "MM" entity (the "Investment Entities"). AREH serves as the non-member, managing member of each of the Investment Entities.

18.    Other entities (collectively, the "JJ Entities"), controlled by the Debtor and

---

[7]    As will be discussed in detail below, the various governing documents for the Arch-affiliated companies were specifically designed to provide checks and balances on controlling parties to protect the rights of Oak, Mr. Simpson, the Debtor, and the Non-Oak Investors.

[8]    The Debtor had two members: Simpson (the managing principal of the Arch Companies) with a 50.1% interest, and Mr. Chassen with a 49.9% interest. See JJ Arch Operating Agreement, dated December 11, 2017, § 1.1, attached as Exhibit A to the Debtor's Plan [Dkt. No. 184]. These percentages were subsequently diluted. The JJ Arch Operating Agreement provides that Mr. Simpson has the power to "conduct, manage and control the affairs and business of the Company," including with respect to its position as "a direct or indirect controlling entity of an Investment Entity".

[9]    AREH has two members: the Debtor, as "Managing Member" with an 80% interest, and Oak, the "Investor Member" with a 20% interest. See AREH Operating Agreement, dated December 11, 2017, §§ 6.1-6.2, attached as Exhibit Q. Pursuant to section 7.1.1 of the AREH Operating Agreement, Mr. Simpson through the Debtor, as managing member, has "full, exclusive and complete discretion" with respect to the management of AREH's "business, affairs and assets," "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters," and the ability to "conduct, manage and control the affairs and business". By contrast, Oak's contemplated passive role as "Investor Member" was to provide capital contributions to fund AREH's general and administrative expenses, and to satisfy costs associated with due diligence into real estate investments, up to $3 million. Id. § 3.1. The AREH Operating Agreement also provided exclusivity to Oak with respect to investment opportunities up to five (5) years after the date of the operating agreement, which expired on December 11, 2022. Id. § 7.2.2. Pursuant to Section 7.1.3 of the AREH Operating Agreement, the Debtor and Oak agreed that both parties would be required to consent to any "Major Decision" undertaken by AREH, including, for example, any decision to "acquire any direct or indirect interests in any real property" or to file for bankruptcy. The AREH Operating Agreement does not disclaim any fiduciary duties of its members.

[10]    Investors serve as limited partners to both the JJ Entities and the Property Owner entities and are afforded similar protective consent rights and governance controls when the managing member self-deals.

Mr. Simpson, serve as members of the Investment Entities.[11]  A corporate control chart is attached hereto as Exhibit A.

19.    Oak was offered the exclusive opportunity to serve for a five (5) year period as a seed equity investor and to provide conditional recourse, carry, and construction completion guarantees for the AREH-managed investments.[12]

20.    A general partner "MM" operating agreement was entered into by the various parties, which typically consisted of Oak, AREH, ARPH I, and the related JJ Entity, for each Investment Entity (collectively, the "Operating Agreements") to establish the rights and obligations of the parties thereto.

21.    Importantly, the economics of the Arch Companies were controlled through ARPH I, with Oak serving as Class A member, the Debtor as Class B member, and Ms. Miller and Ms. Last as Class C members. ARPH I is a party to each of the various Operating Agreements to obtain and distribute profits from the Investment Properties to the Class A, B, and C members. Profits or tier stepped "promotes" were distributed pursuant to a waterfall structure so that when all "limited partner" investor party's returns reached certain agreed upon percentages or "preferred returns", profits could be distributed to the members of ARPH I, including the Debtor. The Debtor's rights to profits from ARPH I was a valuable source of income. The ARPH I Operating Agreement provides that the Debtor has control over the management over ARPH I:

> **The business,** affairs and assets of the Company (including the Company Property) **shall be managed, arranged and caused to be coordinated by Class B Member [JJ ARCH LLC],** who shall have, except as otherwise provided in this Agreement

---

[11]    The JJ Entities include: JJ Haverhill LLC; JJ Tuscaloosa LLC; JJ Center Pointe LLC; JJ Pebble Creek LLC; JJ Columbia LLC; 1700 Alton JJ LLC; JJ Vandam LLC; JJ Midtown Oaks LLC; JJ Myrtle Point LLC; JJ 88 Arch LLC; JJ Cambridge LLC; and JJ Arch Nostrand LLC.

[12]    Oak's exclusive investment period ended, at the latest, in November 2022.

(including, but not limited to, in Section 6.1.3), full, exclusive and complete discretion with respect thereto.

See Section 6.1.1 of the ARPH I Operating Agreement, attached as Exhibit Q (emphasis added).

22.    The Operating Agreements for each Investment Entity are largely identical,[13] and a model was attached to the AREH Operating Agreement. Specifically, Exhibit "D" to the AREH Operating Agreement is a template limited liability company operating agreement, created as a model to be used at each Investment Property, that includes as a member a "JJ Entity," which was to be created and designated at the appropriate time.

23.    Exhibit "D" to the AREH Agreement contains the following provisions (hereafter referred to as the "Consent Provisions"):

7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member [AREH] desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i) engage in any business or activity not authorized by this Agreement;

(ii) enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions[.]

(emphasis added).

24.    The above terms were incorporated as a safe-guard for investors (including Oak,

---

[13]    The Alton transaction is a notable exception.

Mr. Simpson, and Mr. Chassen as well as the Non-Oak investors), providing that any activity not expressly authorized by the respective operating agreement, or any agreement between the managing member of the Investment Entity (or any of the managing member's affiliates) and the Investment Entity (a "self-dealing transaction"), must be unanimously approved by all members of the Investment Entity, including the JJ Entity. Such provisions put an important control over the managing member of the various entities.

25.    These terms were specifically incorporated into the various Operating Agreements. See, e.g., Operating Agreement for Arch Tuscaloosa MM LLC, attached hereto as Exhibit B; Operating Agreement for Arch Nostrand MM LLC, attached hereto as Exhibit C.[14]

**B.  The Arch Companies' Financial Difficulties Emerge**

26.    Owing to financial turmoil in the global real estate investment and lending markets due to high inflation and interest rate growth, substantial disagreements regarding the Arch Companies' future emerged in 2022.

27.    Anticipating issues related to interest rate increases at the Investment Properties, in November 2022, Mr. Simpson and Ms. Last provided Oak with a presentation demonstrating significant future capital needs which Oak would be required to fund. Despite its clear obligations to provide such funding, Oak began to refuse to honor its commitments to provide funding to AREH.[15] At the same time, disagreements arose between Mr. Simpson, on the

---

[14]    The following reveals this structure for one particular Investment Property at inception: (i) the Debtor served as the managing member of AREH; (ii) AREH served as the manager of Arch Nostrand MM LLC, a New York limited liability company (the "MM" entity); while Oak, a JJ entity (JJ Arch Nostrand LLC), and ARHP I served as member entities; (iii) the MM Entity served as the managing member of Arch Nostrand LLC, a New York limited liability company ("Arch Nostrand"), which is the managing member of 1580 Nostrand LLC, a New York limited liability company ("1580 Nostrand"). Importantly, each entity is composed not just of a managing member, but of other members as well, each with a full basket of rights.

[15]    In or around December 2022, Mr. Simpson requested that Oak provide additional capital contributions, consistent with its obligations under Section 3.2 of the AREH Operating Agreement. This obligation to fund AREH was separate and apart from Oaks' obligation to fund capital calls in connection with the individual AREH-managed Investment Properties. While Oak initially fulfilled such obligations, Oak began later to unreasonably demand

one hand, and Oak and Mr. Chassen, on the other hand, regarding their future roles at Arch.

28.     On account of the Arch Companies' financial issues, Mr. Simpson began to explore a possible bankruptcy filing for AREH and the Investment Entities. Despite the companies' precarious financial positions, however, owing to the consent provisions in the Operating Agreements regarding "Major Decisions", Oak's authorization was needed for any such filing. At that time, Oak's principals told Mr. Simpson they would not consent to filing for bankruptcy because they believed that any such filing might trigger numerous personal guarantees they had signed in connection with most, if not all, of the Investment Properties.

29.     Upon information and belief, the Debtor alleges that, to avoid Oak's significant financial obligations related to the guarantees, in the summer of 2023, Oak, Mr. Chassen, and other parties began a process to attempt to sideline the Debtor and Mr. Simpson from the Arch business.[16]  Upon information and belief, such actions were taken to facilitate out of court restructurings that would relieve Oak of its guaranty liabilities, all in contravention of the various governing documents and corporate controls.[17]

30.     By early August 2023, the relationship between Mr. Simpson and Mr. Chassen had completely soured and they had exchanged termination letters. Oak was also

---

that it be released from its guaranty obligations before it would provide additional required funding. See December 20, 2022 email from Frank van Beisen, Oak's CFO, attached hereto as Exhibit R.

[16]  In July 2023, meetings were held between Mr. Chassen and the Wieners and Mr. Chassen instructed Ms. Miller not to tell Mr. Simpson about them. By email dated July 19, 2023, counsel for Oak sent counsel for Mr. Chassen a proposal that required Mr. Simpson to "immediately step[] away from active day-to-day management of Arch and its subsidiaries and relinquish[] authority to act on behalf of Arch and its subsidiaries" and require an amendment of the JJ Arch Operating Agreement "such that Jared [Chassen] has sole control over JJ [Arch]." See 7/19/23 email from Andrew Silberstein, Esq. at Haynes and Boone, LLP to Len Breslow, Esq. at Breslow & Walker, LLP, attached as Exhibit S. Mr. Chassen shared that proposal with his cousin David Berg, who is a principal at the Infinity Collective which is an investor in some of the Arch projects, and Mr. Berg commented on it. See 7/20/23 email from David Berg to Mr. Chassen, attached as Exhibit T.

[17]  For example, Oak refused to provide additional funding for the One Brown property. On June 19, 2023, Oak emailed Simpson that Oak had "decided that our [Oak's] sole interest in this project is now just being released from any liability." Exhibit U, June 19, 2023 email from van Biesen. Oak felt it was not in their "best interest" to "pursue any [] aggressive strategies", but rather "let the lender know we are going to give them the keys and in return we [Oak] would like a release from the guaranties. . . .". The property was eventually foreclosed.

improperly instructing Mr. Chassen that Mr. Simpson had no authority over the Debtor or other Arch affiliates.[18] As such, Mr. Chassen moved to shut off Mr. Simpson's access to the Arch Companies' computer network, his Arch email account, and deactivated Mr. Simpson's physical office access pass. Mr. Chassen had also previously removed Mr. Simpson as a signatory from the Arch Companies' bank accounts at First Republic.[19]

31.    Oak initiated litigation in the District Court for the Southern District of New York on August 10, 2023 (Index No. 23-07089), against Mr. Simpson individually, alleging, among other things, breach of fiduciary duties, tortious interference with prospective business advantage, and defamation. This case was later dismissed by Oak.

32.    Subsequently, on August 14, 2023, Mr. Simpson commenced an action in New York State Civil Court (the "State Court Proceeding"), captioned *Simpson v. Chassen et al.,* Index No. 158055/2023 (N.Y. Co) before the Honorable Joel M. Cohen (the "State Court"), which sought to restore Mr. Simpson's access to his Arch Companies' accounts and re-establish his control over AREH.

33.    Soon thereafter, the State Court imposed an Interim Order holding:

[the Debtor] shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021 (the "JJ Arch Operating Agreement"). Specifically**, the business, affairs, and assets of JJ Arch shall be managed by Simpson,** subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen.  Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements[.]

---

[18]    In an email to Mr. Chassen on August 9, 2023, Michael Wiener instructed Mr. Chassen that "**directions from Jeff [Simpson] should be ignored, as he lacks any and all authority to act on behalf of JJ Arch and the Arch companies**." August 9, 2023 email (emphasis added).

[19]    See August 11, 2023 letter from First Republic Bank, attached hereto as Exhibit V.

See Aug. 21, 2023 Interim Order, attached hereto as Exhibit D (emphasis added). This Interim

Order is still in effect.

34.    At a September 29, 2023 hearing, the State Court emphasized its desire to

maintain the status quo and enforce the consent rights as written in the JJ Arch Operating

Agreement:

> THE COURT: "Your client [Chassen] has a circumscribed set of consent rights
> and other than that, Mr. Simpson is in charge . . . But just basic principles, your
> client does not have a contractual right to be anything other than having his
> consent rights as a member in my opinion" (Tr. 23:7-17.)
>
> THE COURT: "You know what series of orders [I] can [] issue. Courts are not, as
> Mr. Bailey I think rightly put it, we are not comfortable with this role of trying to
> micromanage companies, which is why the purpose of my order was to just say
> look, you have an agreement. Follow it." (Tr. 35:14-19.)
>
> THE COURT: "But I think the way the contract works, you know, substantive
> decisions are up to Mr. Simpson. Unless something happens where something that
> trips a corporate right to remove Mr. Simpson, that's the way it is." (Tr. 54:15-19.)
>
> THE COURT: ". . . I think the short answer to your question is under this
> agreement, subject to the consent rights and to the investor members' rights,
> whatever they may be, Mr. Simpson calls the shots." (Tr. 55:7-10.)

Sept. 29, 2023 Hearing Transcript, attached hereto as Exhibit E.

35.    On October 10, 2023, Oak brought a complaint against Mr. Simpson, the

Debtor, and AREH in a separate proceeding in New York State Court, in which it sought a

temporary restraining order and preliminary injunction "restraining Defendants from initiating a

bankruptcy action in respect of AREH or any entity subject to the AREH LLC Agreement" and

"a declaration that no bankruptcy action may be initiated for any entity subject to the AREH LLC

Agreement without [Plaintiff's] consent." See Complaint in NYSCEF Index No. 654963/2023,

attached hereto as Exhibit F. Defendant Mr. Simpson removed the action to the United States

District Court for the Southern District of New York (the "District Court"). S.D.N.Y. Case No.

23-cv-8966. Three days later, Oak filed an emergency motion asking the District Court to remand

the case or to enjoin Mr. Simpson, the Debtor, and AREH from taking any bankruptcy action. On October 13, 2023, District Court Judge Carter granted the temporary restraining order pending a hearing on the preliminary injunction. At the subsequent hearing, Judge Carter asked the parties to confer and commence settlement discussions. Judge Carter requested that, if possible, that Mr. Simpson delay a larger Arch-related bankruptcy filing to see if the parties could reach an understanding. Oak eventually dismissed this case following the actions of the State Court described below.

36.     During the same period that the District Court action was occurring (on October 17, 2023), Oak intervened in the State Court Proceeding, and as a part of that intervention, Oak sought the temporary appointment of a receiver and further requested "a preliminary injunction making Oak the managing member [of AREH] during the pendency of th[e] litigation." In support of its request, Oak represented to the Court that its primary motivation in seeking to be installed as managing member of AREH was to determine to what extent additional funding was necessary to ensure continued operation of AREH and its affiliates.[20] Throughout this period, Mr. Simpson worked diligently, attempting to restructure the various obligations of the Investment Properties.

37.     While the parties engaged in litigation in various courts, the Arch Companies were experiencing severe financial distress, with Oak refusing to provide additional capital, notwithstanding its obligations to do so and its representations to the State Court.[21]

---

[20]    Contrary to these assertions, Oak continued to avoid its financial obligations. For example, the State Court noted that AREH's finances were at an "immediate crisis point" with respect to unpaid payroll and asked Oak's counsel if Oak would provide funding if made Managing Member, to which Oak's counsel replied, "Yes, we would." (Nov. 3, 2023 Hearing Transcript (NYSCEF 374), 21:3-11.).  Notwithstanding this statement, Oak allowed invoices to go unpaid, shuttered AREH's offices, left AREH with only a handful of employees, and otherwise failed to adequately fund AREH to meet its obligations.

[21]    On Wednesday, October 25, 2023, the Debtor, as managing member of AREH, issued a capital call to Oak due to a severe liquidity crisis that included AREH not having sufficient funding to meet its payroll obligations. Simpson sought $300,000 in emergency funding for payroll and employee benefits by Monday, October 30, 2023.

38.    On October 27, 2023, the State Court issued an Interim Order directing the parties to "comply with their existing obligations" under the AREH Operating Agreement and prescribed a number of supervisory procedures setting the method and schedule by which the Debtor was required to provide books, records, analysis and status updates to Arch. See October 27, 2023 Interim Order attached hereto as Exhibit G. Importantly, despite temporarily appointing Oak as AREH's managing member, the State Court also opined, in a footnote, that "**the Major Decision consent rights contained in the AREH LLC Agreement with respect to Bankruptcy Actions are enforceable.**" Id. at 3 n.3.

39.    On October 31, 2023, Oak sent a notice to Mr. Simpson that it intended to remove the Debtor as AREH's managing member pursuant to the "flip-flop" provisions of section 7.1.4 of the AREH Operating Agreement. On November 3, 2023, Oak moved for a temporary restraining order and preliminary injunction removing the Debtor as AREH's managing member.

40.    On November 22, 2023, the State Court granted Oak's motion and ordered that during the pendency of the present action, "Oak shall continue to act in their [JJ Arch's] stead as AREH's sole managing member in accordance with Section 7.1 of the Limited Liability Operating Agreement of AREH (the "Operating Agreement"), owing all applicable duties to AREH and its member." See November 22, 2023 Order attached hereto as Exhibit H (the "State Court Order").  The State Court also enjoined Mr. Simpson and the Debtor from:

> [a]cting as (or holding themselves out to third parties to be) managing members of Arch Real Estate Holdings LLC ("AREH"), and . . . [d]enying prompt consent to any Major Decision proposed by Oak as Managing Member . . . unless both JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such

---

See Oct. 25, 2023 email from Simpson to Mr. van Biesen and the Wieners regarding October 24, 2023 Capital Call, attached hereto as Exhibit W. With no response from Oak, on Friday, October 27, 2023, counsel for Mr. Simpson and the Debtor followed up with counsel for Oak, stressing the "severe liquidity issue" and the upcoming Monday payroll deadline. See Oct. 27, 2023 email chain between counsel for Simpson and counsel for Oak, attached hereto as Exhibit X. Despite its contractual obligation to provide the funding, Oak tried to capitalize on the cash crisis it had created by conditioning the funding of payroll on, among other things, an "[e]xtension of TRO/commitment not to file any bankruptcy petition without consent." Id.

consent . . . . [and] [o]therwise interfering with Oak's ability to exercise its
responsibility as Managing Member of AREH.

See State Court Order at 2.

41.     While the State Court Proceeding centers on the dispute regarding control
of AREH, none of the Debtor's rights regarding the JJ Entities or the JJ Entities' rights regarding
the Investment Entities have been previously addressed in the State Court Proceedings. Mr.
Simpson, who serves as the Debtor's sole managing member also serves as the sole managing
member of each of the JJ Entities.

## C.  Oak as Managing Member

42.     The Debtor alleges that since obtaining temporary control of AREH, Oak, with
Mr. Chassen's assistance and/or blessing, has allowed chaos to ensue. Bills have gone unpaid and
properties have gone into foreclosure. Upon information and belief, such actions have also
violated Oak's fiduciary duties to the Non-Oak Investors and caused other related defaults under
the governing documents.[22]

43.     A major reason for the chaos is that control over AREH alone cannot impute

---

[22]  Appointing Oak as temporary managing member has also resulted in numerous defaults on account of lenders
taking the position that the change results in an unauthorized "change of control." For example, on January 11,
2024, AREH received a Notice of Default (the "Cambridge Default Notice") from a lender on a $6.9 million loan
given to AREH-affiliated investment vehicles. See Exhibit Y attached hereto (Jan. 11, 2024 Letter from Shipman).
The Cambridge Default Notice explains that the loan agreement "prohibits transfers (including involuntary
transfers) of direct or indirect legal or beneficial interests in any Restricted Party". Likewise, on November 10,
2023, a different lender on a $15.8 million loan sent a Default Notice and Demand for Payment (the "Melrose
Default Notice") giving notice that the appointment of Oak as "acting manager" of AREH was an Event of Default
under the applicable Loan Agreement. See Nov. 10, 2023 Letter from White and Williams LLP, attached as
Exhibit Z. In that instance, the lender gave notice to the borrower entities and the guarantor, Oak, that "all amounts
outstanding under the Loan Agreement and the Loan Document are due and owing, and the Lender hereby
demands immediate repayment in full." (Id.) The Melrose Default Notice explicitly cites this litigation and Oak's
request to be appointed as Managing Member of AREH as triggering the default.

Moreover, since taking control, upon information and belief, Oak has: (i) failed to pay outstanding legal bills;
(ii) failed to pay security and other maintenance bills at the Investment Properties; (iii) terminated AREH's lease
for its main working location; (iv) failed to hold required investor meetings; and (v) fired and failed to fill key
positions. Oak has also failed to supply Mr. Simpson with information required to be provided under the Operating
Agreements and cancelled his health insurance.

control over the various Investment Properties. As noted above, the complex corporate structure put in place requires the consent of multiple parties. Rather than working together with the Debtor to obtain such consent, however, Oak and Mr. Chassen have ignored corporate formalities and sought to act alone. For example, Oak has conflated investors at the JJ Entities and Property Owner levels and sent them all capital calls, when in fact, Oak as the temporary managing member of AREH has no ability to make such requests of JJ Entity investors. Similarly, upon information and belief, Oak has homogenized investors when calling for investor meetings. While such meetings could be done when the Arch Companies' management was under one umbrella by one person acting in different roles, Oak as temporary managing member of AREH, simply does not have such authority.

44.    Rather than follow corporate formalities, Oak and Mr. Chassen's have instead chosen to singularly focus their temporary control of AREH on entering into a series of transactions on behalf of the Investment Entities chiefly designed to rid Oak of its financial obligations, including its considerable guarantee obligations, in violation of the terms of the Operating Agreements.[23] Upon information and belief, Oak has moved forward on such transactions without consent because it understands that it would never obtain the necessary consent from counterparties to approve the actions it has taken if asked. The Debtor asserts that such transactions have materially damaged its interests (and those of the Non-Oak Investors) in

---

[23]    Oak itself acknowledges that the change in control of AREH was only meant to be temporary and only last during litigation:

The Preliminary Injunction Order is merely provisional in nature and was secured to preserve the AREH-controlled properties for the benefit of all parties, including Lender. (See Affidavit of Dana King (NYSCEF No. 298), Affirmation of Michael Wiener, ¶ 42 (NYSCEF No. 305)). And because JJ Arch was removed as managing member (on a provisional basis) pursuant to a court order, the prior removal notice, dated October 31, 2023, is completely irrelevant. JJ Arch was only removed as managing member pursuant to a court order.

See Letter from Meister, Seeling & Fein, dated April 22, 2024, attached hereto as Exhibit AA.

the Investment Properties.

45.    Upon information and belief, many of these transactions have resulted in self-dealing between Oak, Mr. Chassen, and the respective Property Owner. All transactions involving members constitute "Major Decisions", requiring unanimous consent. Despite this fact, Oak has not sought the necessary consent of the respective JJ Entity in accordance with the respective Operating Agreement. Upon information and belief, Oak has also failed to comply with the informational requirements of the Operating Agreements.

46.    While in some instances, Oak and Mr. Chassen have asserted that Mr. Chassen has given the required approval at AREH, Mr. Chassen has no authority to grant any consent with respect to the JJ Entities.

47.    Through these *ultra vires* actions and others, the Debtor, through its interests in the Investment Entities and ARPH I, has been harmed, in that the value of the Debtors interests in the Investment Entities have been reduced, and its important property rights in the consent requirements of the Operating Agreements have been violated. Moreover, any possibility of further profits through its Class B interests in ARPH I have been extinguished.

48.    Owing to the failure to deliver information as required pursuant to the respective Operating Agreements, the Debtor is not aware of all of the various *ultra vires* actions taken by Oak and Mr. Chassen (and Infinity) that may violate the consent requirements.

49.    Below, however, are examples of actions taken in violation of the Operating Agreements at certain of the Investment Properties. The Debtor will seek to amend this Complaint as additional information surfaces:

1.    **The Tuscaloosa Properties**

50.    In accordance with the AREH Operating Agreement, in July 2021, AREH, Oak, JJ

Tuscaloosa LLC (as the "JJ Entity"), and ARPH I entered into the limited liability company operating agreement for Tuscaloosa MM LLC, relating to three (3) properties located at in Tuscaloosa, Alabama ("Tuscaloosa Properties").[24]

51.     Further consistent with the AREH Agreement, the Tuscaloosa Operating Agreement contains the Consent Provisions.

52.     The underlying investment involved a portfolio of garden apartments in Alabama. As with other investments, Oak provided carry and completion guaranties.

53.     Upon information and belief, the operative loan requires an extension in th near term and additional capital is required to fund the operations and maintenance of the Tuscaloosa Properties. Despite the Consent Provisions, Mr. Simpson has not been provided any information.

**2.  Alton Property**

54.     Regarding the Alton Property, which involves a hotel located at 1700 Alton Road, in Miami Beach, Florida, 1700 Arch JJ LLC, as managing member, entered into a Limited Liability Agreement with Oak, as non-managing member. The operating agreement contains the Consent Provisions.  See Section 6.1 and 6.1.3 of the 1700 Arch LLC Operating Agreement. Infinity serves alongside 1700 Alton Manager LLC as co-manager of the property owner.

55.     As with other Operating Agreements, for certain "Major Decisions", unanimous consent among co-managers is required. Major Decisions include termination of significant leases.

56.     Two weeks ago, the Debtor was informed by management (who is a relative of Mr. Chassen) that a material lease was terminated notwithstanding that the Debtor affiliated parties'

---

[24]    These include the following properties: (i) Cooper Creek, 3504 12th Ave E., Tuscaloosa, AL 35405; (ii) Broadmoore Gardens, 235 James I Harrison Jr. Pkwy., Tuscaloosa, AL 35405; and (iii) Woodlawn Manor, 3820 1st Ave, Tuscaloosa, AL 35405.

consent had not been sought.[25]

### 3.  <u>Myrtle Point Transaction</u>

57.     In accordance with the AREH Agreement, AREH, Oak, JJ Myrtle LLC (as the "JJ Entity"), and ARPH I entered into the limited liability company operating agreement for Myrtle MM LLC, relating to a mixed-use development in Ridgewood, New York (the "<u>Myrtle Point Transaction</u>").

58.     As part of the Mrytle Point Transaction, the respective property owner entity entered into a construction loan in the amount of $106.2 million from Madison Realty Capital ("<u>Madison</u>"). Oak is a guarantor on the loan for construction, completion, carry costs, and traditional non-recourse carve-out guarantees.

59.     Upon information and belief, interest payments of approximately $1 million (at the nominal rate) a month have not been paid on the loan since May 1, 2023, and in July 2023, there was approximately $9.5 million owed to subcontractors on the project. <u>See</u> July 13, 2023 email from G. Sammarco to Mr. Chassen and Mr. Simpson, attached hereto as <u>Exhibit I</u>. Upon information and belief, AREH had been in negotiations with Madison since June 2023 on a forbearance agreement whereby Oak would provide funding to true-up the unpaid interest. Upon information and belief, Oak's proposal was that they would provide the funding in exchange for being released from the guaranty to the extent construction was completed and the property was at 75% occupancy by the end of the forbearance period. <u>See</u> June 28, 2023 email from Jerry Feuerstein, attached as <u>Exhibit J</u>. Upon information and belief, that agreement was never finalized

---

[25]  <u>See</u> email from David Berg on August 22, 2024, acknowledging that the hotel's lessor was evicted, attached as <u>Exhibit BB</u>. This action, which constitutes a "Major Decision", was taken without first seeking the consent of the Investment Entity or any other parties' consent, all in contravention of the management provisions in section 7.1.3 of the governing agreements. Mr. Berg also acknowledged that he was not going to seek consent from the co-manager.

and AREH was left helpless to satisfy its obligations under the loan without further funding from Oak.

60.     On December 11, 2023, Kevin Wiener emailed Mr. Simpson seeking preliminary consent regarding a planned forbearance agreement with Madison whereby Oak would be released from its guaranty in exchange for funding only $3 million in capital.[26] Upon information and belief, in the event of further default on the loan, Madison would simply record a deed in the box, and the only party that would benefit from such an arrangement would be Oak, because it would allow Oak to dodge tens of millions of dollars in guaranty exposure for the nominal amount of $3 million. Upon information and belief, if Oak were acting in accordance with its fiduciary duties to AREH and other investors, not to mention the subcontractors which remain unpaid for their work, filing for bankruptcy with respect to the property would be a possible solution to re-work the loan. Instead, upon information and belief, Oak is acting in its own self-interest to avoid its guaranty obligations by handing the keys to Madison.

61.     Oak's focus on its own guaranty exposure is plainly detrimental to the Debtor and other investors on the Myrtle Point Transaction. Indeed, the largest equity holder in the Myrtle Point Transaction, Douglas Propp, believes Oak is conflicted and that Oak's intended agreement with Madison "would be inconsistent with the fiduciary duties [Oak] owes to [him] as a member/investor." See Declaration of Douglas Propp, dated January 23, 2024 ("Propp Decl.") ¶ 9, attached hereto as Exhibit K. Oak has similarly ignored Mr. Propp's requests for current financial information and documentation for the purported agreement. Id. ¶ 8.

**4. The Columbia Property**

62.     An AREH affiliate entity invested in four multifamily properties in Columbia,

---

[26]     See Dec. 14, 2023 email from J. Simpson, attached as Exhibit CC.

South Carolina. This project involved a $35 million loan, for which Oak served as a guarantor (and, upon information and belief, continues to serve as guarantor). In October 2023, Mr. Simpson was informed that the loan was likely to go into default. On December 12, 2023, Kevin Wiener emailed Mr. Simpson and Mr. Chassen requesting that one of them provide consent, on behalf of the Debtor, for AREH to enter into an agreement with the lender to "get approximately $600k of funding to pay outstanding payables on the property, cover payroll, and allow sufficient time for the new property manager to get put in place." See Dec. 12, 2023 email from Kevin Wiener, attached as Exhibit L.

63.    Certain of these funds – two months' worth of accounts payable – would be directed not to the properties, but to Oak. See Draft December 2023 Letter Agreement at 2, attached hereto as Exhibit M. Mr. Simpson replied, voicing a number of objections to this plan based on Mr. Simpson's expertise, including Oak's plan to hire a third-party property manager. Mr. Simpson presented other solutions to the cash flow issue but received no response from Kevin Wiener. See Dec. 14, 2023 email from J. Simpson, attached as Exhibit N.

64.    On January 2, 2024, Kevin Wiener emailed again seeking the Debtor's consent to cause the borrower entities to enter into the protective advance agreement. See Jan. 2, 2024 email from Kevin Wiener, attached as Exhibit O. Again, Mr. Simpson objected to the solution as it would be "essentially giving the keys to the lender since there is no remedy for anything that could have gone wrong . . . or potentially what will go wrong in the future." See Jan. 2, 2024 email from Mr. Simpson, also attached as Exhibit O. In essence, Oak was asking for a protective advance where monies were to be reimbursed to Oak, to the detriment of the property and its equity investors.

65.    Mr. Simpson has heard that the property has been marketed and received offers but has not seen any information regarding a possible sale.

**5. Mr. Chassen's Defaults**

66.    On August 31, 2023, Mr. Simpson made a Capital Call to Mr. Chassen pursuant to
Section 4.2(b) of the JJ Arch Operating Agreement. Mr. Chassen failed to meet that Capital Call.
By operation of Section 4.2(c) of the JJ Arch Operating Agreement, the unpaid Capital Call was
deemed to be a "Member Default Loan."

67.    Under Section 4.2(d), a "Member Default Loan" is secured by a "security interest,"
meaning, the "Non-Contributing Member's Company Interest including, without limitation, the
Non-Contributing Member's right to distributions hereunder." And "such security interest may be
foreclosed upon . . . in the event that during the period in which a Default Loan is outstanding,
distributions are paid to the Non-Contributing Member prior to payment in full of all amounts
(including interest) owed under the Default Loan."

68.    Despite this language, and his failure to make the requested Capital Call, upon
information and belief, Mr. Chassen has continued to make distributions to himself while the
Member Default Loan has been outstanding, in violation of Section 4.2(d). Upon information and
belief, these have included distributions that would have otherwise been impermissible,
notwithstanding the outstanding Member Default Loan—such as using the Debtor's funds to pay
his personal cell phone bills and car insurance. See, e.g., NYSCEF Nos. 462, 463, excerpts of JJ
Arch bank records for the periods August 1, 2023 to September, 24, 2023, and September 29, 2023
to December 23, 2023, attached hereto as Exhibit P.

## I.    Declaratory Judgment

69.    The Debtor incorporates by reference paragraphs 1 to 68 of this Compliant as if
fully set forth herein.

70.    The Defendants have engaged in actions which have circumvented the Consent

20

Provisions under the Operating Agreements, thus denying the Debtor's property rights.

71.     An actual controversy exists between the parties, and the Debtor is entitled to a Declaratory Judgment declaring that the actions taken by the Defendants in violation of the Consent Provisions are void.

## II.     Injunctive Relief

72.     The Debtor incorporates by reference paragraphs 1 to 68 of this Compliant as if fully set forth herein.

73.     There is no adequate remedy at law.

74.     The Debtor requests that the Court enter injunctive relief restoring the status quo prior to Defendants' circumvention of the Consent Provisions under the Operating Agreements.

## III.     Compensatory Damages
## for Violations of the Operating Agreements

75.     The Debtor incorporates by reference paragraphs 1 to 68 of this Compliant as if fully set forth herein.

76.     The Defendants have engaged in actions which have served to circumvent the Consent Provisions under the Operating Agreements, thus denying the Debtor's property rights.

77.     To the extent that transactions taken in violation of the Consent Provisions of the Operating Agreements cannot be unwound, the Debtor, on account of its interests in the various JJ Entities, and as managing member and Class B member of ARPH I, should be awarded damages owing to such violations.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Debtor seeks an order from the Court:

1. Finding that the Defendants have violated the Consent Provisions as set forth in the Complaint;
2. Voiding those actions taken by Defendants in violation of the Consent Provisions; and
3. To the extent that actions taken in violation of the Consent Provisions have been taken, but cannot be unwound, awarding damages to the Debtor; and
4. Granting such other relief as the Court deems just and proper.

Dated: New York, New York
         September 18, 2024

DAVIDOFF HUTCHER & CITRON LLP

By: */s/ Jonathan S. Pasternak*
        Jonathan S. Pasternak
605 Third Avenue
New York, New York 10158
(212) 557-7200
jsp@dhclegal.com
*Attorneys for the Debtor*

JJ ARCH, INC. BY:

/s/ Jeffrey Simpson
_____
JEFFREY SIMPSON, as managing member

**<u>Verification</u>**

     JEFFREY SIMPSON declares, under 28 U.S.C. § 1746 under penalty of perjury, that I have read the foregoing Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

                          /s/ Jeffrey Simpson

                          _____
                          JEFFREY SIMPSON

**SCHEDULE A**

| LLC Entity | Location of Property |
|---|---|
| JJ Arch Nostrand LLC | 1580 Nostrand Ave.<br>Brooklyn, NY |
| JJ Haverhill LLC | 3200 N Haverhill Rd.<br>West Palm Beach, FL |
| JJ Tuscaloosa LLC | Cooper Creek<br>3504 12th Ave E.<br>Tuscaloosa, AL 35405 |
| JJ Tuscaloosa LLC | Broadmoore Gardens<br>235 James I Harrison Jr. Pkwy.<br>Tuscaloosa, AL 35405 |
| JJ Tuscaloosa LLC | Woodlawn Manor<br>3820 1st Ave<br>Tuscaloosa, AL  35405 |
| JJ Pebble Creek LLC | Forestdale<br>Birmingham, AL |
| JJ Center Pointe LLC | Center Pointe Landings<br>107 Sterling Court NW<br>Center Point, AL 35215 |
| JJ Center Pointe LLC | City Landing Apartments<br>856 Park Brook Trail<br>Birmingham, AL 35215 |
| JJ Center Pointe LLC | Village Square Landings<br>4141 Pinson Valley Parkway<br>Birmingham, AL 35215 |
| JJ Columbia LLC | Mallard Pointe Apartments<br>1101 Halbrook Dr.<br>Columbia, SC 29209 |
| JJ Columbia LLC | Austin Woods Apartments<br>7648 Garners Ferry Rd.<br>Columbia, SC 29209 |
| JJ Columbia LLC | Harbour Landing Apartments<br>7625 Garners Ferry Rd. |

| | Columbia SC 29209 |
|---|---|
| JJ Columbia LLC | Ravenwood Hills Apartments<br>4215 Bethel Church Rd.<br>Columbia, SC 29206 |
| JJ Vandam LLC | 9 Vandam St.<br>New York, NY 10013 |
| JJ Midtown Oaks LLC | 1351 Dekalb Ave.<br>Brooklyn, NY 11221 |
| JJ Midtown Oaks LLC | 1010 Bushwick Ave.<br>Brooklyn, NY 11221 |
| JJ Midtown Oaks LLC | 435 Central Ave.<br>Brooklyn, NY 11221 |
| JJ Myrtle Point LLC | 3-50 St. Nicholas Ave.<br>Queens, NY 11385 |
| JJ 88 Arch LLC | 88 University Pl.<br>New York, NY 10003 |
| JJ Cambridge LLC | 10101-10133 Claude Freeman Dr.<br>Charlotte, NC |
| 1700 Alton JJ LLC | 1700 Alton Road<br>Miami, Florida |

.

.