UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: JJ ARCH LLC,

Appellant.

Case #24-08649 (JAV)

Bankr. Pro. #24-10381 (JPM)

Before the Honorable
Jeannette A. Vargas

**APPELLANT BRIEF**

Appellant JJ Arch LLC ("Appellant" or the "Debtor") respectfully appeals from the Memorandum Opinion and Order to Dismiss the Chapter 11 Case, dated October 11, 2024 (the "Dismissal Order"),[1] in the underlying bankruptcy proceeding (the "Bankruptcy Proceeding") before the Honorable John P. Mastando III (Bankr. Doc. #215, Mot. to Dismiss.)

JJ Arch appeals on the three issues presented below and prays that the Court reverse the dismissal and restore the Bankruptcy Proceeding, for the United States Bankruptcy Court to retain jurisdiction over this action, pending and subject to the New York Supreme Court's final disposition with respect to the non-core issues remanded to the case-in-chief, *Simpson v. Chassen*, Index #158055/2023 (N.Y. Supr. Ct. N.Y. County, Comm. Div. Aug. 15, 2023) ("*Simpson v. Chassen*, *supra*," the "Supreme Court Action," or "State Court Action").

**PRELIMINARY STATEMENT**

On March 7, 2024, Simpson petitioned the Bankruptcy Court under Chapter 11 of the U.S. Bankruptcy Code, for the purpose of protecting the Debtor's majority and controlling

---

[1]    The Dismissal Order incorporates, insofar as applicable, the findings of fact and conclusions of law announced in two prior Bankruptcy Proceeding rulings from June 10, 2024 – *i.e.*, the Memorandum Opinion and Order to Remand the Chapter 11 Case (the "Remand Order"), and the Memorandum and Opinion and Order to Lift the Automatic Stay (the "Lift Stay Order"). (Bankr. Docs. #131-32, Remand and Lift Stay Orders.)

interests in the Arch Companies ("Arch")[2] through its membership in Arch Real Estate Holdings

LLC ("AREH"),pursuant to the AREH Operating Agreement,[3] and under property-level

investment agreements with investment entities, which duly designated Simpson as their

managing member and principal fiduciary through JJ Arch. (AP Doc. #1, Verified Compl. ¶¶22.)

The record demonstrates that the Debtor's Chapter 11 case was filed in good faith for a

legitimate reorganization purpose, with a viable liquidating plan that proposed to pay all allowed

claims in full, and that it was done so under the good faith belief of valid contractual authority.

Simpson stood in the way of Oak's desire to seize control of the AREH portfolio in order to strip

its assets of value, handover keys to settle loan obligations, and unjustly enrich itself by both

avoiding required capital calls and extracting the net profits of their divesture. This litigation is

the direct result of Simpson's well-informed business decision to bring the AREH portfolio of

assets under the protections and transparency afforded by a restructuring plan and workouts

under a Chapter 11 bankruptcy on behalf of JJ Arch. But only three months into the Bankruptcy

action, Great American acceded to demands by Oak, a non-insured adversary, that it disrupt and

discontinue Simpson's cost of defense coverage. (NYSEC Doc. #929 (Oak's counsel: "Jeff

transfers to Oak his equity and managing member role in every 'JJ [property]' entity";

"Insurance pays Oak everything remaining under the policy (assuming significant majority of

limits remain"; "Jeff/JJ Arch dismisses the bankruptcy; stay lifted *nunc pro tunc* on consents and

---

[2]    Arch's portfolio includes numerous affiliated property-level, standalone investment and operating entities, and their respective shares are held by approximately one hundred twenty-five investors who, collectively, invested over $100 million. (*JJ Arch LLC v. 608941 NJ Inc.*, Case #24-04025 (S.D.N.Y. Sept. 14, 2024) ("AP") Doc. #1, Verified Complaint ¶15.) At its peak, the value of the Arch's assets under management exceeded $1 billion in commercial and residential real estate investments, including 5.7 million square feet and fifteen active investments in seven states. (*Id.* ¶14; *see also id.* Sched. A (Arch's portfolio of investment properties and associated entities).)

[3]    AREH Operating Agreement. (NYSCEF Doc. #2) The Arch Property Holdings I ("APH") Operating Agreement further provides that "[t]he business, affairs and assets of [APH] shall be managed, arranged and caused to be coordinated by Class B Member [JJ ARCH LLC]," which "shall have, except as otherwise provided in this Agreement, full, exclusive and complete discretion with respect thereto." (NYSCEF Doc. #792 § 6.1.1.)

Jeff agrees not to challenge any transactions for which he disputes adequate consents.").)

The voices of Arch's more than one hundred investors are absent here. *But see Wietschner v. 9 Vandam JV LLC*, Index #155573/2023 (N.Y. Supr. Ct. N.Y. County, Comm. Div. Nov. 8, 2023). JJ Arch is one of 9 Vandam JV LLC's members. The Bankruptcy Court's legitimate concern over good faith and "gamesmanship" reflect Oak's litigation tactics and false allegation that the Debtor filed for bankruptcy solely to disrupt the Supreme Court Action. The full picture, however, weighs decisively in favor of restoring the Bankruptcy Proceeding. AREH and Chassen are not disinterested parties. Their litigation positions are adverse to the estate and risk undermining the Debtor's ability to prosecute claims and administer estate property.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 158(a)(1) because this appeal arises from the Dismissal Order in the underlying case. Venue is proper pursuant to 28 U.S.C. § 158(a), as the Bankruptcy Court for the Southern District of New York presided over the proceeding. This appeal was timely filed under Rule 8002(a) of the Federal Rules of Bankruptcy Procedure.

## ISSUES PRESENTED

1.      Whether the totality of the circumstances warrant bad faith whether subjectively or objectively, notwithstanding the asymmetrical nature of the litigation against Simpson, evidence of collusion amongst his adversaries, and where his decision to bring JJ Arch into bankruptcy was based on the legal advice of multiple outside counsel and withdrawn assurances from JJ Arch's directors and officers insurer to afford Simpson "costs of defense" coverage.

2.      Whether the record supports gross mismanagement under 11 U.S.C. § 1112(b)(4)(B) where Simpson lacked consistent legal representation, lack access to Arch's books and records, with Oak maintaining his own personal and business records, and in the face of an

onslaught of litigation attacks by derivative and proxy adversaries and forum-shopping under a joint-defense compact designed to evade federal review of Arch's national real estate portfolio.

3.      Whether the estate reflects a substantial or continuing loss or diminution of value under 11 U.S.C. § 1112(b)(4)(A) since filing for bankruptcy, where a non-creditor adversary maintains a campaign to defame, disparage, and publicly humiliate the Debtor's representative, in order to distort or distract from the truth of his allegations, while his adversaries have failed to account for the value of Arch's assets, failed to provide discovery, and evaded responsibilities to attend court hearings and submit to cross-examination, while at the same time providing inconsistent information within the State and Federal Courts.

## STATEMENT OF THE CASE

### I. Factual Background

In November 2017, Simpson founded Arch through JJ Arch LLC ("JJ Arch") and AREH, joined by former junior partner, Appellee Jared Chassen. JJ Arch is organized under the laws of New York State. Among other responsibilities, JJ Arch invested in real property nationwide via AREH, as well as directly. For over five years, it served as Arch's sole managing member.

At its peak, Arch's assets under management exceeded $1 billion in value. (Bankr. Doc. AP Doc. #1 ¶14.) 35 Oak Holdings Ltd. is headquartered in the Toronto area which, under the AREH Operating Agreement, operates through its subsidiary in the United States, 608941 NJ, Inc. ("Oak"). Oak issued real estate loan guarantees through 608941 NJ Inc. Oak holds a minority stake in Arch. subject to an "Investment Expiration Date" of December 2022, which was five years from when the AREH Operating Agreement began.

At all relevant times, Simpson served as JJ Arch's managing member. (NYSCEF Doc. #3-4.) Chassen was a junior member with a "stepped" structure that would have resulted in joint

control by the fourth anniversary of the JJ Arch Operating Agreement by December 2021. (*Id.* #3 Sched. A.) Before the vesting date, however, Simpson and Chassen modified the JJ Arch Operating Agreement in May 2021 (the "Amendment," and collectively, the "JJ Arch Operating Agreement"). (*Id.* #3-4.) The Amendment increased Chassen's distribution rights to 49%, subject to contractual restrictions, in exchange for eliminating any and all consent rights. (*Id.* #4.)

Under the JJ Arch Operating Agreement before it was amended, certain "Major Decisions" required Chassen's consent. (*Id.* #3 § 3.) Those consent rights were eliminated under the Amendment. (*Id.* § 3.) Major Decisions included standard partnership consent rights, including filing for a bankruptcy. (*Id.* § 3; *see also id.* #604 (Order to Show Cause, dated February 9, 2024, referencing the "JJ Arch Operating Agreement (as amended)"), #906 at 22:19-23 (hearing transcript: "THE COURT: The agreements that I have read, unless they're not genuine, suggest that in 2021 there was an amendment to the operating agreement of the managing member which cemented [Simpson] as in charge of virtually everything.").)

Under the AREH Operating Agreement, JJ Arch and Oak were the sole members of AREH, subject to the exclusivity reflected in the Investment Expiration Date. (*Id.* #2.) As AREH's investor member, Oak guaranteed loans which backed real estate investments managed through AREH, with JJ Arch as its managing member. Not only did Oak guarantee loan obligations for the benefit of the lenders under individual property-level loans, Oak further provided protection by agreeing to indemnify the Debtor. (*Id.* § 7.6.4.) Importantly, Oak's guarantee obligations followed the terms of each guarantee that it executed, including under terms which survived beyond the five-year sunset provision in the AREH Operating Agreement. Oak's guarantee obligations were designed to survive until the final liquidating transaction of asset, or until such point in time as the lender release Oak from the guarantee. (*Id.*; *see also id.*

#768) Oak had the right to guarantee each individual investment. (*Id.* #2 § 7.) During the five-year exclusivity period, if Oak were to decline a total of five investments presented by JJ Arch, any of which may include a loan guarantee, its rejection of the fifth such investment would extinguish its exclusivity rights. (*Id.*) Oak never rejected any investment that JJ Arch proposed.

Oak's responsibilities as investor member were to provide loan guarantees on investments which it approved, to supply a $3 million line of credit as necessary to ensure Arch had sufficient operating capital and corporate overhead, and to fulfill the financial loan covenants for the benefit of each lender. (*Id.* §§ 3, 7.) Coinciding with the expiration of its five-year exclusivity rights under the AREH Operating Agreement, however, Oak expressed its lack of intention to fulfill its investor member obligations at either the property-level with respect to capital call obligations and loan guarantees, or the corporate-level line of credit.

The record in the Supreme Court Action includes an email chain between Chassen and Oak's Chief Financial Officer, Frank Van Biesen, in addition to multiple emails including Van Biesen and Michael Wiener, Oak's Chief Executive Officer. (*Id.* #773 (email from Michael Weiner stating that Oak was insolvent and must borrow capital at a high interest rate); *see also id.* #781 (Van Biesen: "I don't have a good forward view on what is coming at us (cashflow-wise) but we definitely need to look at options and ideas before the whole thing becomes a fire sale."); #783 (Van Biesen: "The table below is me (and me only) projecting our capital position and recovery forecast. I have not, nor will I, discuss this internally. I would like you and I to review (no MW, no Jeff) when you have a little time.").) In these emails, Van Biesen acknowledged that Oak lacked the access to capital necessary to fulfill its capital obligations.

Despite limited testimony, these emails serve as an authenticated documentary record showing that Oak was facing capital calls which it projected would erode or eliminate its return

on investment. Although Simpson's adversaries have painted a picture that Simpson through JJ
Arch somehow had mismanaged Arch's portfolio and that Arch itself was a failure, less than a
year before, in early 2022, Arch achieved its most successful yield in its nearly five-year history
at the time – namely, having sold a $200 million portfolio of real property consisting of 2,000
multifamily garden apartments located in North Carolina, South Carolina, and Florida. The
section below continues with a chronological history from late 2022 to present.

## II. Procedural History

*November 2022 to March 2023* – Oak announces that it will not make capital calls. The
record shows that as early as November 2022, Simpon provided Oak's principals with
projections indicating that AREH would need an infusion of $15-20 million over the next twelve
months, resulting from the exponential increase in interest rates. (*Id.* #366, 372 (portfolio
analyses and cash needs); *see also Great Am. Ins. Co. v. Arch Real Estate Holdings LLC,* Case
#25-02375 (S.D.N.Y. Mar. 20, 2025), Doc. #19 at 5.) Simpson and his team developed a workout
plan with nearly every individual lender in order to save the company, at which time Simpson
offered to the lenders to take on personal guarantees for which he had no obligation under any of
the Operating Agreements or loan documents. (NYSCEF Doc. #779 (workout plan); *see also id.*
#898, 902 (referencing an agreement with a recapitalization broker regarding dissolution.).)

At approximately the same time, JJ Arch was receiving notices from lenders that their
loans were out of balance at certain properties, triggering Oak's unmet funding duties, namely
capital calls, which in turn triggered lenders to stop funding loan draws that were funding
property-based construction and turnover costs – all of which meant that Arch was running out of
capital to fund its operations. Continuing into the summer, many of the properties under the

AREH umbrella exhibited unmet capital needs, and a number fell into disrepair.[4] By early 2023, however, "Oak told Chassen and Simpson that it had cash issues on multiple occasions." As referenced above, in an email exchange amongst Chassen, Michael Wiener, and Van Biesen, Van Biesen professed that Oak lacked the funds necessary to guarantee Arch's assets.

*March to July 2023* – Dissolution and recapitalization plan advised and initiated. By July 2023, an outside law firm formally advised Simpson that, without Oak satisfying capital calls, the situation would continue to deteriorate, leaving JJ Arch with three options: 1) corporate dissolution and winding down the real estate; 2) finding a replacement guarantor or new equity party amidst economic downturn; or 3) that JJ Arch, as managing member of AREH, avail itself of the protections of Chapter 11 of the U.S. Bankruptcy Code. (*Great Am. Ins. Co.*, *supra*, at 5.)

All parties initially consented to proceed with a dissolution and recapitalization plan as a first option, while simultaneously investigating a replacement guarantor or equity investor. To this end, the parties engaged an investment advisory firm, which was charged with focusing on capital replacement for at-risk properties facing capital calls. (NYSCEF Doc. #898, 902 (recapitalization and dissolution plan).) Although Oak approved of the process in concept, as defaults mounted, Oak actively began a campaign designed to defeat the very dissolution and recapitalization plan that it had approved, and attempting to solicit investors to join in, contrary to its limited rights and authority under the AREH Operating Agreement. (*Id.*)

---

[4]     In one instance, a property manager reported being threatened with a gun. Work orders were increasing and rental income was diminishing. As late as March 2025, multiple contacts at Arbor Realty Trust, Inc. ("Arbor") requested that Mr. Simpson listen in on a conference call, about the decline of a residential community under AREH's portfolio, however Mr. Simpson was invited in his capacity as a key principal. The property is financed through Fannie Mae. During the call, Mr. Simpson learned that Fannie Mae had rated community properties – many of which had been best-performing assets within AREH portfolio – at its lowest level of performance. The rating was based on metrics including cleanliness, leasing activity and occupancy, maintenance, and safety. They remain at risk of foreclosure without an influx of capital for corrective action. (*Great Am. Ins. Co., supra*, Doc. #19 at 5-6).)

The emails provided through the motion practice in the Commercial Division show that Simpson's desire to file for bankruptcy on behalf of *AREH*, which was advised by JJ Arch's outside corporate counsel, Breslow & Walker. LLP –*without considering JJ Arch at the time*, as JJ Arch also directly owned certain non-Arch properties – catalyzed a battle for corporate control over Arch itself. The dispute over control of the Arch carried over into this bankruptcy proceeding after JJ Arch's subsequent bankruptcy counsel, Griffin LLP, advised protecting Arch's estate in Simpson's sole capacity as managing member of JJ Arch.[5] It was Oak itself that first sought relief in the Federal Court, in a lawsuit against Simpson in *608941 NJ Inc. v. Simpson*, Case #23-07089 (S.D.N.Y. Aug. 10, 2023), and dismissed in February 2024.

*Early August 2023* – Battle for control over AREH's management of real estate: [before he sours the relationship email.] On August 6, 2023, designated *non pro tunc* to August 4, 2023, Chassen signed a so-called "joint defense" agreement between himself and Oak. (*Id.* #889.) On August 7, 2023, Simpson learned that Chassen requested First Republic Bank – which held the operating and escrow bank accounts on behalf of AREH, JJ Arch, YJ Simco LLC, and various affiliates, in addition to Simpson's personal bank accounts – to remove him as an authorized user. First Republic Bank, now part of JPMorgan Chase, NA, complied. (*Id.* #119 (email exchange between Chassen and First Republic Bank).)

On August 5, 2023, Simpson served Chassen notice of termination for cause. On August 6, 2023, Chassen sent his own termination notice to Simpson. Also on the same day, Oak attempted to completely eliminate JJ Arch from its role as managing member under the AREH Operating Agreement. (*Id.* #67-69.)

---

[5]     Appellant acknowledges former counsel, Scott A. Griffin, Esq., Wiggins & Dana LLC, formerly of Griffin LLP, for his representation early in the Bankruptcy Proceeding's commencement through early June 2024, and of Jonathan S. Pasternak, Esq. and James B. Glucksman, Esq. from Davidoff Hutcher & Citron LLP, and for their representation in the *JJ Arch LLC v. 608941 NJ Inc. et al.*, *supra*, adversary proceeding.

*Mid-August to Present* – Litigation ensues:

*August 10, 2023*: Oak files *608941 NJ Inc. v. Simpson*, Case #23-07089. *supra*. Oak later abandoned the case by failing to serve process.

*August 15, 2023*: Simpson files the case-in-chief before the Honorable Joel M. Cohen of the New York Supreme Court, Commercial Division. *Simpson v. Chassen*, *supra*, The case did not name Oak as a defendant, on advice of counsel in consideration of the pending federal action filed by Oak five days beforehand. By October 2023, intervened as a party, making factual allegations and pleading causes of action in common with, and expanding on, its federal filing. Oak's first filing in the Supreme Court, on October 17, 2023, attempted to shoehorn all "JJ Arch Controlled Properties and/or Entities" into receivership. (NYSCEF Doc. #225 (proposed Order to Show Cause.) The motive can only have been to eliminate or gloss over Oak's reliance on JJ Arch – and, in turn, on Chassen – for consenting to Major Decisions involving the restacking of financial interests over the Arch-managed real estate or the liquidation of its assets. At the same time, the strategy would insulate Oak to some degree from derivative lawsuits by aggrieved investors; although the AREH and JJ Arch Operating Agreements confer no such authority.

*October 10, 2023*: When Simpson refused to acknowledge that he would not file for bankruptcy on behalf of AREH, Oak filed *608941 NJ Inc. v. Simpson*, Index #654963/2023 (NY Supr. Ct. N.Y. County Oct. 10, 2023), captioning AREH as a defendant. The federal action of the same name that Oak filed in Federal Court on August 10, 2023 was active pending Oak serving Simpson and JJ Arch with the summons and complaint at the time. The action demanded an inspection and accounting of AREH's books and records, which were provided extensively, although the same information remains lacking from November 2023, when Oak assumed

temporary control over AREH, to present. Most importantly, Oak's chief request was that the

Supreme Court enjoin JJ Arch from filing for bankruptcy on behalf of AREH.

*October 12, 2023*: Counsel for JJ Arch and Simpson removed the action as reflected in

*608941 NJ Inc. v. Simpson*, Case #23-08966 (S.D.N.Y. Oct. 12, 2023), over the Honorable

Andrew L. Carter Jr. presided. The basis for removal was that Oak moved for a temporary

restraining order in the Supreme Court which, as pled by Mr. Griffin, "[sought] to deprive

Defendant of the federal constitutional right to seek bankruptcy protection – a question governed

by federal law – without allowing Defendant to assert that right in federal court." Although the

Commercial Division stayed the case, Oak had already taken the necessary steps by to abandon

the action before Judge Carter following a status conference, which was held on October 25,

2023. In the status conference, His Honor ordered that the parties meet and confer in the interest

of resolving the disputed issue of whether AREH may, through JJ Arch, file for bankruptcy.

Docket entry #28 contains the following order (emphasis added):

> ORDER: Pursuant to today's conference, the temporary restraining
> order is EXTENDED to November 2, 2023. The parties are
> ORDERED to file a join status report on or before October 31,
> 2023. The Court will hold a telephonic conference in this action for
> a preliminary injunction on November 2, 2023 at 3PM Eastern
> Time. All Parties shall appear and should contact the Court at 1-
> 888-363-4749 (access code: 3768660) ( Telephone Conference set
> for 11/2/2023 at 03:00 PM before Judge Andrew L. Carter Jr.)."

The word "bankruptcy" appears 103 times within the 54-page hearing transcript.

Around the same time, Oak effectively discontinued the case it filed in the Supreme

Court on August 10, 2023, the first litigation commenced amongst the parties, because the

Southern District authorized its removal in light of the federal questions it raised over JJ Arch's

right to pursue bankruptcy. By letting both cases languish, Oak effectively avoided having to

appear at a status conference in either case involving a fundamental legal issue that it appeared to

be losing. Instead, Oak intervened in the Supreme Court Action and brought motions designed to lock up JJ Arch's assets and steer Arch's portfolio from bankruptcy, while evading the consequences of the status conference which Judge Carter ordered the parties to attend.

During the approximately three-week time period that Oak's case was subject to the District Court's jurisdiction in the case before Judge Carter, as referenced above, Oak sought to place all entities that were controlled by or affiliated with JJ Arch, and JJ Arch itself, into receivership. Nearly every business day, between October 17 and 25, 2023, Oak or Chassen filed new papers in the Supreme Court designed to accompany and support their demand for a show-cause hearing (NYSCEF Doc. #225-88), leading Judge Cohen to admonish their "barrage of correspondence on a variety of topics … that the Court did not request:" (*Id.* #290).

*October 31, 2023*: As stated in the Verified Complaint initiating the JJ Arch Adversary Proceeding: "Oak sent a notice to [Simpson] that it intended to remove the Debtor as AREH's managing member pursuant to the 'flip-flop' provisions of section 7.1.4 of the AREH Operating Agreement." (AP Doc. #1, Verified Compl. ¶39.) Three days later, on November 3, 2023, Oak moved for a temporary restraining order and preliminary injunction to remove JJ Arch as AREH's managing member. (*Id.*) The next month, the State Court issued the Interim Orders as described in the Remand Order. (Bankr. Doc. #131, Remand Order at 7-8.) Pursuant to the Interim Orders, Oak was to act in place of JJ Arch as AREH's managing member in accordance with section 7.1 of the AREH Operating Agreement. (Bankr. Doc. #131, Remand Order at 7-8.)

The Verified Complaint observes a number of "moral hazards" associated with Oak's exclusive management of the AREH portfolio. Chief among them, the governing operating agreements require the consent of multiple parties, including the lenders and investors who stand to gain or lose in each transaction. "Rather than working together with the Debtor to obtain such

consent, however, Oak and [Chassen] have ignored corporate formalities and sought to act alone." (AP Doc. #1, Verified Compl. ¶43.) The net result is that Oak is passing on its own obligation to fund capital calls to the property-level investment entities themselves.[6] *(Id.)*

*November 2023 to March 2024*: Simpson self-funded legal counsel until running out of money in November 2023. At same time, despite earlier wins, Simpson lost control of AREH in the State Court Action. Between November 2023 and January 2024, he proceeded *pro se*, lacking the financial reserves or ongoing liquidity necessary for legal representation. Attorney Robert Lorenc, Esq. appeared on a limited scope of representation, however Great American advanced or promised to indemnify Simpson for attorneys' fees pursuant to a commercial directors and officers ("D&O") commercial insurance policy, starting in March 2024, for the express purpose of Simpson commencing the Bankruptcy Proceeding (the "D&O Policy"). (*See Great Am. Ins. Co.*, *supra*, Doc. #19.) Relying on assurances from Great American's outside counsel, on March 7, 2024, Simpson filed the instant bankruptcy action, individually, on behalf of JJ Arch, and derivatively as managing member of AREH. (*See id.*) AREH and Chassen immediately challenged Simpson's legal authority to move the Arch properties into Chapter 11 through JJ Arch, notwithstanding Oak's failed attempt to force JJ Arch into receivership.

---

[6]     The Verified Complaint alleges as follows:

> Rather than follow corporate formalities, Oak and [Chassen] have instead chosen to singularly focus their temporary control of AREH on entering into a series of transactions on behalf of the Investment Entities chiefly designed to rid Oak of its financial obligations, including its considerable guarantee obligations, in violation of the terms of the Operating Agreements. Upon information and belief, Oak has moved forward on such transactions without consent because it understands that it would never obtain the necessary consent from counterparties to approve the actions it has taken if asked. The Debtor asserts that such transactions have materially damaged its interests….

(AP Doc. #1, Verified Compl. ¶44.)

Despite providing express assurances of coverage, on which Simpson detrimentally relied in filing JJ Arch's petition with the Bankruptcy Court in March 2024, Great American disclaimed having any further duty to provide uninterrupted costs of defense coverage, and it interpleaded the parties in June 2024. The record also suggests that Great American imposed improper conditions on future coverage payments, including that Simpson provide express written consent to a Great American-proposed distribution plan with Chassen for the balance of the remaining insurance funds. More problematic, the record also reveals that Oak – a non-insured adversary – influenced Great American's decision not to continue to fund Simpson's legal representation. (See *Great Am. Ins. Co.*, *supra*; NYSCEF Doc. #929.)

*September 22, 2024*: Chassen files *Chassen et al. v. Simpson*, Index #654928/2024 (NY Supr. Ct. N.Y. County, Comm. Div. Sept. 24, 2024). This action leveraged Chassen's disputed standing through JJ Arch as a co-owner with Simpson of the four properties named in the receivership order, however it also named several of JJ Arch's property-level investment entities. Chassen then requested that Justice Cohen order Simpson to post a $10 million bond, after the Court had issued preliminary findings against Chassen's self-imposed authority to "terminate" Simpson and institute himself as managing member of JJ Arch. (NYSCEF Doc. #186.)

Exhibit F to the bond pleading shows that Chassen led the Court to believe facts that are in direct opposition to disclosures made to the Bankruptcy Court. (*Id.* #192.) In support his bond request, Chassen asserted individual and personal passive investment interests in identified JJ Arch investment entities. (*Id.*) Chassen pled to the Bankruptcy Court, however, that the JJ Arch investment entities were completely unrelated to JJ Arch. These alleged facts, which Chassen affirmed in his motion urging that the Bankruptcy Court dismiss the case, are false.

*February 25, 2025*: Moreover, the record indicates that Chassen misinformed the

Bankruptcy Court about whether he ever received compensation from Oak, irrespective of any

advancement or reimbursement of his legal fees, from August 2023 to present. (Bankr. Doc. #43,

Chassen Decl., Mar. 25, 2024.) In his declaration, Chassen affirmed that he understands that he

would be deemed to have resigned under the JJ Arch Operating Agreement if he accepts

compensation from a third party, and that he has not received compensation from any source

other than JJ Arch. (*Id.* ¶¶11-12.) In his cross-examination in the State Court Action nearly a year

later, on February 25, 2025, however, Chassen admits to having received compensation in

August 2023. (NYSCEF Doc. #1346 at 107:10-108:16; *see also id.* #192 (bond pleading).)

## ARGUMENT

### I. Simpson Acted in Good Faith as Arch's Principal Fiduciary

Dismissal for bad faith requires "an intent to abuse the judicial process." *Clear Blue*

*Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 68 (E.D.N.Y. 2012). Dismissal motions

must be brought with "great caution" and allege "supportable findings both of the objective

futility of any possible reorganization and the subjective bad faith of the petition." *In re 9281*

*Shore Road Owners Corp.*, 187 B.R. 837, 848 (Bankr. E.D.N.Y. 1995) (quoting *Carolin Corp. v.*

*Miller*, 886 F.2d 693, 694 (4th Cir. 1989)); *see also In re 68 West 127 Street, LLC*, 285 B.R. 838,

844 (Bankr. S.D.N.Y. 2002) ("The existence of 'bad faith' depends not on any one specific factor

but on a combination of factors determined after careful examination of the facts."). "It is the

totality of circumstances, rather than any single factor, that will determine whether good faith

exists." *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) (citing *In re*

*Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2nd Cir. 1991)). Upon finding the movant

satisfies this high standard, "the burden shifts to the debtor 'to establish good and sufficient

reasons why the relief should not be granted.'" *In re Squires Motel, LLC*, 426 B.R. 29, 34

(N.D.N.Y. 2010) (quoting *In re Yukon Enters., Inc.*, 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984)).

As the Dismissal Order details, at the time the petition was filed, the "critical test" of bad

faith hinges on two questions: "(i) whether there was 'no reasonable likelihood that the debtor

intended to reorganize' (the 'subjective bad faith' prong); and (ii) whether there was 'no

reasonable possibility that the debtor will emerge from bankruptcy' (the 'objective futility'

prong)." Dismissal Order at 31 (citing *In re Hudson 888 Owner LLC*, 2024 WL 1145664, at *4

(Bankr. S.D.N.Y. Mar. 15, 2024) (citing *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d at 227; *In re

Loco Realty Corp.*, 2009 WL 2883050, at *3 (Bankr. S.D.N.Y. June 25, 2009)).

As provided below, the Bankruptcy Court's finding of bad faith rested on a false narrative

presented by adverse parties, which are evidenced by Oak's forum-shopping between State and

Federal venues, further corroborated by Chassen's inconsistent testimony within the Supreme

Court Action and the Bankruptcy Proceeding. Simpson's filing was based the advice of multiple

law firms throughout the preceding year and from the moment the post-pandemic interest-rate

crisis began, all of which advised that he had the right, if not the duty, to do so to preserve Arch's

fiducial integrity. Bankruptcy had long been envisioned as desirable if not essential to centralize

control, preserve Arch's rights, and put forth a combined liquidating and restructuring plan.

A. Simpson Personally Affirmed the Petition for a Legitimate Fiducial Purpose

Particularly given the chronology of events, the Bankruptcy Court understandably viewed

the filing as a litigation tactic rather than an exercise of fiduciary responsibility. When read in

full, the governance agreements confirm that the Debtor acted within its rights and structure, and

that its efforts to preserve estate value were both lawful and proper. The Debtor's "Plan of

Liquidation" (the "Plan"), filed on September 3, 2024 (the "Plan") was not a litigation tactic but

a *bona fide* effort as a fiduciary to protect and maximize value for creditors and stakeholders.
(Bankr. Doc. #185, Opp. to Dismissal at 2; Bankr. Doc. #184, Liquidation Plan.)

Simpson filed for bankruptcy for the sole purpose of "protect[ing] the Debtor's most
valuable asset – its interest in AREH and individual investments by the Members (and limited
investors) in the Investment Entities, as typically 50% owner (alongside Oak) —from a sustained
campaign of asset-stripping, self-dealing, and operational sabotage by Oak and its affiliates."
(Bankr. Doc. #185, Opp. to Dismissal at 2; *see also* AP, Doc. #1, Verified Compl. ¶ 1.)

The Dismissal Order found as follows: "[T]he record overwhelmingly suggests that this
bankruptcy was a means of removing the State Court Proceeding from the purview of Justice
Cohen. This is indicated by Simpson's three unsuccessful attempts to nullify the Interim Order
(particularly the AREH Interim Order) in the months leading up to the filing of the petition."
(Bankr. Doc. #215, Dismissal Order at 33.) Simpson used a regretful choice of words in an email
exchange the day preceding the bankruptcy filing with Oak principal, Kevin Weiner: "YOU
DUPED ONE JUDGE, YOU WON'T DUPE OTHERS …." (Bankr. Doc. #215, Dismissal Order
at 33-34.) Oak's counsel then posted the email to the NYSCEF docket.

Although it was not directed at Justice Cohen, such invective was not isolated and it
defies the civility and respect due when presenting oneself before the institution of the judiciary.
Undeniable in that sense, a party's brashness does not reveal ill-intent or gamesmanship. *In re
Squires Motel, LLC*, 426 B.R. at 34 ("[A] rebuttable presumption of bad faith arises and the
burden shifts to the debtor 'to establish good and sufficient reasons why the relief should not be
granted.'"); *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (following
the standard articulated in *Kingston Square Assocs.* for bad faith dismissal). Simpson's expulsion
as JJ Arch's managing member, particularly as the subject touches on his fallout with Chassen, is

deeply personal. Although it is true that Simpson's posture has been far from perfect, multiple

corporate law firms for more than a year beforehand cautioned him, in his role as Arch's

managing fiduciary, that bankruptcy was the only viable solution. With the passing of time,

Simpson became more and more convinced that bankruptcy was necessary to protect Arch's

creditors, many of whom being the family and friends of all of JJ Arch's members.

### B. Simpson's Adversaries Distorted the Petition's Objective Legal Merit

#### i. Chassen Is Captive to an Undisclosed Joint Defense Agreement

The record indicates a sustained pattern of coercion by Oak over Chassen, which it has

operationalized through a joint defense agreement. Only days before infiltrating JJ Arch, Oak

began exerting undue influence under a joint-defense compact with Chassen, which raises

troubling questions about whether Chassen's is independently participating in either proceeding.

Recent evidence that has emerged in the State Court Action, moreover, suggests that Oak is

subordinating his interests to its own. Adversarial collusion and coordinated insider efforts to

undermine the debtor-in-possession weigh heavily against dismissal, as courts must evaluate the

totality of the circumstances when determining good or bad faith, but the presence of coordinated

insider misconduct or coercion rebuts any inference of bad faith by showing a legitimate

reorganization purpose in preserving the estate from improper control.

The Debtor's Verified Complaint in the adversary proceeding describes how "Oak,

working together with Chassen, have allowed chaos to reign at the Arch Companies by either

completely ignoring, or trampling over, the contractual consent rights of the Debtor and the

Debtor's non-debtor affiliates, all in a concerted effort to relieve Oak of hundreds of millions of

dollars in property loan guarantee obligations related to numerous Arch property investments"

(AP Doc. #1, Verified Compl. ¶ 1.) Not only did Oak provide these obligations to the lenders in

the loan documents, they provided protection via indemnification to the Debtor under section 7.6.4 of the AREH Operating Agreement.

In addition to informing the implementation of the Court's remand order, the disclosure of any joint-defense or common-interest agreement among the adversary parties is directly relevant to the continued propriety of the Lift Stay Order issued contemporaneously with that remand. The Lift Stay Order granted limited relief from the automatic stay to allow the State Court Proceeding to go forward for the purpose of adjudicating a threshold corporate governance issue. Implicit in that order was the Court's expectation that the adversaries in the state court would proceed independently and in good faith, and that the state proceeding would not be used as a coordinated procedural mechanism to disadvantage the Debtor.

If, however, the parties purportedly adverse to the Debtor in the state court are in fact operating pursuant to a joint defense or common-interest agreement, that coordination could bear materially on the Court's assessment of whether the stay relief remains equitable and appropriate. For example, such coordination may affect the procedural fairness of the state proceeding, the strategic framing of issues central to corporate control, and the adversaries' joint ability to influence the outcome in a manner not apparent from the record before the Court at the time the stay was lifted. Disclosure at this juncture would therefore assist the Bankruptcy Court in ensuring that the basis for the Lift Stay Order remains sound, and in exercising its continuing authority to adjust or monitor that relief if necessary.

The automatic stay under 11 U.S.C. § 362(a) applies broadly to all proceedings that could affect the debtor's estate and serves as a vital procedural protection. Relief from the stay is governed by section 362(d), which allows lifting the stay for cause. Although case is an undefined term, it is applied under a case-specific standard. There is no rule or statutory

requirement that abstention or remand of a non-core issue also requires that the stay be lifted. A range of factors are relevant, including judicial economy, potential harm to the estate, risk of inconsistent rulings, and whether the adversary parties seek to pivot the stay with clean hands.

As this Court recognized in the Lift Stay Order, whether "cause" exists to lift the stay requires a careful weighing of circumstances under the well-established *Sonnax* framework. See *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir. 1990) ("Whether 'cause' exists to lift the automatic stay is determined on a case-by-case basis by examining a number of factors"); *In re Bogdanovich*, 292 F.3d 104, 110 (2d Cir. 2002) ("The statute does not define what constitutes 'cause' to lift the stay; courts must determine whether cause exists on a case-by-case basis"); *In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (judicial economy, the interests of the debtor and creditors, and the potential for inconsistent results are all factors in whether to lift the stay); *In re New York Medical Group, P.C.*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001) ("The legislative history indicates that the automatic stay is intended to provide the debtor with a 'breathing spell' from litigation."). The cases confirm that continued stay relief depends on fundamental transparency into the parties and their litigation posture, and that such determinations remain within the Bankruptcy Court's discretion as circumstances evolve.

### iii. Chassen Gave Inconsistent Testimony in the Federal and State Actions

Inconsistent testimony by a party seeking control over the debtor-in-possession requires close scrutiny because it has significant negative implications for estate administration. *In re SCK Corp.*, 54 B.R. 165, 169 (Bankr. D.N.J. 1984) ("[C]ontrol of a debtor in possession goes to the very heart of the administration of the debtor's estate."). The Bankruptcy Court expressed concern over "Chassen, AREH and Oak's continuing efforts to frustrate the discovery process." (Bankr. Doc. #131, Abstention Order.) Apart from Chassen's limited testimony through repeated

objections at the evidentiary hearing on February 25, 2025, and the fact that Simpson is the only party to have been deposed, are testament to Oak's sustained efforts to avoid discovery or examination. Simpson and Chassen have been "diametrically opposed" and fail to agree "on almost anything." (Bankr. Doc. #148, Opp. to Remand; *see also id.* ("Chassen and Oak have been desperate to avoid exposure to the sunshine of discovery and cross-examination.").)

Simpson's AREH-related adversaries in each of these State Court Actions have failed to account for [hundreds] of properties within the AREH portfolio since seizing control. No one except for Simpson speaks for any of the investors, a number of whom are his personal and professional friends, in addition to members of his own family, and of his synagogue. There has been no disclosure of what they stand to gain or lose. Material witnesses have not testified or been disclosed,[7] and documents have been withheld, including a joint defense agreement which, based on physical evidence, exists among Oak, AREH, and Chassen. The unhedged nature of Oak's ongoing risk as guarantor conflicted with its responsibilities to Arch's creditors since involving Chassen to stage a hostile takeover its multimillion-dollar portfolio in August 2023. Still now, Oak has never been compelled to account for the allegations of self-dealing in its administration of the Arch portfolio, nor for inspection of books and records concerning how it is managing the once $1 billion real estate portfolio that Simpson built and curated over five years.

*iii. AREH Is Oak's Simulacrum*

Not only did no creditor move to dismiss, the dismissal was orchestrated through Oak's undisclosed third-party influence in both the Supreme Court Action and the dismissed adversary proceeding between JJ Arch and 608941 NJ Inc. Oak's main principals, acting in both sets of proceedings through 608941 NJ Inc., have provisionally served as AREH's managing member

---

[7]      (*See also* NYSECF Doc. #148 (indicia of witness intimidation).)

under Interim Orders, with AREH advancing its interests. Oak has flourished in the absence of

federal jurisdiction, which shifted power from the debtor-in-possession to parties whose interests

were directly adverse to the estate. This deprived the Debtor of the opportunity to pursue value-

maximizing strategies and prevented resolution of a valid and viable plan.

AREH and Chassen's arguments are "functionally identical." (Bankr. Doc. #215,

Dismissal Order at 9.) The body of evidence of their collusion since dismissal corroborates the

objections of Appellant's former counsel:

> Chassen, AREH and Oak argue that there is no good faith,
> legitimate purpose for this Chapter 11 Case….

> That AREH and Oak (which, given Oak's current control over
> AREH, are effectively one and the same for purposes of the various
> contested matters in this Chapter 11 Case and this adversary proceeding)
> take that position is not surprising. Their primary goal in this Chapter 11
> Case is to maintain control over AREH, with Chassen acting as their proxy
> in connection with the Debtor's consent rights. The benefits to the Debtor
> and other interested parties of a confirmed plan under chapter 11 of the
> Bankruptcy Code are directly adverse to Oak's claims against the Debtor.]

(Bankr. Doc. #185, Opp. to Dismissal ¶¶15-16.)

The Second Circuit has, moreover, held that the existence of parallel litigation, or even an

intent to gain tactical advantage, does not alone constitute bad faith. See In re SGL Carbon

Corp., 200 F.3d 154, 166 (3d Cir. 1999). The relevant inquiry is whether the filing serves a valid

reorganization purpose, and where a confirmable plan exists that protects creditors' interests, that

purpose is satisfied. Just as "[i]is well-established that 'state-court losers complaining of injuries

caused by state-court judgments' cannot use the federal judiciary as an appellate court under the

*Rooker-Feldman* doctrine (*see, e.g.*, *Hunter v. McMahon*, 75 F.4th 62, 65 (2d Cir. 2023)), the

opposite is true insofar as one party is prejudiced by an adversary filing or joining duplicative

actions, particularly when it displays forum-shopping between the State and Federal Courts.

## II. Post-Petition Gross Mismanagement – Section 1112(b)(4)(B)

Oak and AREH's coordinated role directly affects the feasibility of any Chapter 11 plan.

*In re Ne. Indus. Dev. Corp.*, 513 B.R. 825, 839 (Bankr. S.D.N.Y. 2014), *affirmed*, 2015 WL

3776390 (S.D.N.Y. June 16, 2015) ("[T]he resolution of the adversary proceeding directly

impacts the feasibility of the Plan, such that the issues in this proceeding are inextricably

intertwined with the main bankruptcy case.").

In losing coverage for essential legal representation in the Bankruptcy and State Court

actions already underway, Simpson was stripped of legal direction and guidance, and left to

defend himself against personal attacks on his managerial style as Member Manager of JJ Arch.

Simpson is a professional real estate investor, developer, manager, and financing restructurer, as

well as a State-licensed general contractor, in the New York City-based commercial real estate

market. Divested of legal counsel, he was left to defend himself pro se against an onslaught of

attacks and burdensome motion practice and countersuits by two former partners, acting in

concert with AREH since seizing control in November 2023. Investment losses in the AREH

portfolio were a direct result of Oak holding back funding necessary to protect AREH's assets.

The AREH operating agreement demanded Oak's funding obligations. The record demonstrates

feasibility through detailed financial projections and asset valuations. (Bankr. Docket #184,

Liquidation Plan; *see also id.* Doc. #185, Opp. to Dismissal at 22–28.) Oak's management of its

own risk relative to others in the AREH portfolio has been less than transparent.

## III. Substantial or Continuing Loss or Diminution in Value – Section 1112(b)(4)(A)

Under § 1112(b)(1), dismissal is not mandatory unless the court finds "cause." While

"cause" includes a non-exclusive list of grounds, the most commonly cited provision — §

1112(b)(4)(A) — requires both a "substantial or continuing loss to or diminution of the estate"

and "the absence of a reasonable likelihood of rehabilitation." Both prongs must be met. *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997). Even if it doing so was improvident at the time, JJ Arch filed for bankruptcy while represented by sophisticated corporate counsel engaged in what has turned out to be an unconventional warfare – and one which bears strong indications of movants' collusion, ostensibly under the influence or control of a single, non-party adversary to this proceeding. The Debtor's Plan proposed to liquidate non-core assets and distribute the proceeds to creditors. The plan projected payment in full on all allowed claims. (Bankr. Doc. #185, Opp. to Mot. to Dismiss at 14-15; *see also id.* Doc. #148, Opp. to Remand at 13.) Courts have repeatedly recognized that where a debtor proposes a feasible liquidating plan and actively administers the estate, there is no "continuing loss" and the plan provides a reasonable path forward. *In re FRGR Managing Member LLC*, 419 B.R. 576, 582 (Bankr. S.D.N.Y. 2009). Here, the Plan "sets forth its intention to sell certain assets, pay in full all Allowed Claims, and, following the Effective Date of the Plan and subject to payment of all Claims, the Reorganized Debtor will distribute the remainder of its assets to the holder of Interests or his nominee" (Bankr. Doc. #185, Opp. to Dismissal at 2.)

Conversely, good faith may be found when the debtor demonstrates the existence of "unusual circumstances" that are aligned with the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1)-(2); *see also In re BH S & B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) ("Once a party establishes cause, a court must examine whether dismissal … is in the best interests of the creditors and the estate."). Unusual circumstances in this case include strong indicia of collusion amongst non-creditor adversary parties, a highly complicated corporate structure, and an unprecedented post-pandemic spike in interest rates.

As further support, no creditor moved to dismiss the case. The motion was brought by

AREH and Chassen – insiders with an interest in derailing the estate's claims and returning control to state court litigation. Their objections focused on litigation tactics, not the Debtor's compliance with its fiduciary obligations. Great caution applies in practice against granting dismissal where the real goal is to gain leverage in a two-party dispute. *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996).

## CONCLUSION

For the foregoing reasons, Appellant respectfully prays that this Court:

(1)     Reverse the Dismissal Order and restore the Bankruptcy Proceeding;

(2)     Remand the case to the Bankruptcy Court for further proceedings—

    (a)     Retaining jurisdiction, subject to the final disposition of the non-core issues remanded to <u>Simpson v. Chassen</u>, Index #158055/2023 (N.Y. Supr. Ct. N.Y. County, Comm. Div. Aug. 15, 2023) under the Remand Order;

    (b)     Providing for judicial inquiry into any joint-defense or other such common-interest agreements by or among any of the parties to this action, so that the Bankruptcy Court may determine whether to maintain or set aside the Lift Stay Order pending resolution of the case on remand; and

(3)     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: July 1, 2025
      Hartford County, Connecticut

MAIDEN LANE LAW GROUP

Benjamin Robert Rajotte, Esq.
One Maiden Lane, Suite 900
New York, New York 10038
(212) 463-6669
rajb@mllg.nyc

*Attorneys JJ Arch LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: JJ ARCH LLC,<br><br><br>Appellant. | Case #24-08649 (JAV)<br><br>Bankr. Pro. #24-10381 (JPM)<br><br>Before the Honorable<br>Jeannette A. Vargas<br><br>**VERIFICATION** |

I, Benjamin Robert Rajotte, Esq., pursuant to 28 U.S.C. § 1746, declare under penalty of

perjury that this submission is true and correct to the best of my knowledge, information, and

belief, formed after an inquiry reasonable under the circumstances.


Respectfully submitted,

Dated: July 1, 2025                    MAIDEN LANE LAW GROUP
       Hartford County, Connecticut

Benjamin Robert Rajotte, Esq.
One Maiden Lane, Suite 900
New York, New York 10038
(212) 463-6669
rajb@mllg.nyc

*Attorneys JJ Arch LLC*