FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb   Doc 45-22   Filed 07/24/25   Entered 07/24/25 15:32:23   Exhibit
Pg 1 of 27

# Exhibit 2

LIMITED LIABILITY COMPANY OPERATING AGREEMENT
OF
JJ ARCH LLC

LIMITED LIABILITY COMPANY OPERATING AGREEMENT, made as of the 11th day of December, 2017 by and between JARED CHASSEN, an individual residing at 47 Bridge Street, 6A, Brooklyn, New York 11201 ("Chassen"), and JEFFREY SIMPSON, an individual residing at 1230 Park Avenue, 16E, New York, New York 10128 ("Simpson").

In consideration of the covenants and conditions set forth in this Agreement, the parties agree to amend and restate the Original Agreement it its entirety and agree as follows:

ARTICLE 1

CERTAIN DEFINITIONS

1.1    Specific Terms.        For purposes of this Agreement, the following terms shall have the following respective meanings:

Affiliate:  With respect to a specified Person, (i) a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person, (ii) any Person who is an officer, director, member or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, member or trustee, or with respect to which the specified Person serves in a similar capacity, and (iii) any Person who, directly or indirectly, is the beneficial owner of 50% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest.  An Affiliate does not include a Person who is a partner in a partnership or joint venture with the Company or any other Member if such Person is not otherwise an Affiliate of the Company or any Member.

AREH:  Arch Real Estate Holdings LLC, a New York limited liability company.

AREH Operating Agreement:    That certain Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC, dated of even date herewith, between the Company and 608941 NJ INC., as the same may be amended from time to time.

Articles of Organization:  That certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on December 1, 2017, as the same may be amended from time to time.

Bankruptcy Action:  With respect to any Member, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 3 of 27

reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

Business Day:  Any day other than Saturday, Sunday or any other day on which commercial banks or savings and loan associations are required or authorized by law to close in New York, New York.

Buy Sell Closing:  As defined in Section 8.2.

Buy/Sell Demand Notice:  As defined in Section 8.1.

Buy/Sell Deposit:  As defined in Section 8.2.

Buy/Sell Exercise Notice:   as defined in Section 8.2

Buy/Sell Initiating Member:  As defined in Section 8.1.

Buy/Sell Option Period:  As defined in Section 8.2.

Buy/Sell Purchasing Member:  As defined in Section 8.2.

Buy/Sell Responding Member:  As defined in Section 8.1

Buy/Sell Sale Interest:  As defined in Section 8.2.

Buy/Sell Sale Interest Purchase Price:  As defined in Section 8.1.

Buy/Sell Selling Member:  As defined in Section 8.2

Capital Accounts:  As defined in Section 4.3.

Capital Call Amount:  As defined in Section 4.2(b).

Capital Call Notice:  As defined in Section 4.2(b).

<u>Capital Contributions</u>:  The capital contributions of the Members made pursuant to Section 4.2.

<u>Capital Loan</u>:  As defined in Section 4.2.

<u>Cash Flow</u>:  Gross cash receipts of the Company (excluding Fee Revenue), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) such reserves as may reasonably be deemed necessary by the Members "<u>Reserves</u>").

<u>Cause Event</u>:  With respect to a Member, the occurrence of a Cause Event (as defined in the AREH Operating Agreement) with respect to such Member.

<u>Code</u>:  The Internal Revenue Code of 1986, as amended from time to time, or any similar Federal internal revenue law enacted in substitution for the Code.

<u>Company</u>:  The limited liability company formed pursuant to this Agreement.

<u>Company Interest</u>:  The ownership interest of any Member in the Company.

<u>Company Law</u>:  The New York Limited Liability Company Law, as amended from time to time.

<u>Company Major Decision</u>:  As defined in Section 3.2.

<u>Contributing Member</u>:  As defined in Section 4.2(c).

<u>Control, controlled or controlling</u>:  The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

<u>Covered Person</u>:  The Member or any Affiliate thereof, or any officer, director, shareholder, partner, employee, representative, agent or spouse of a Member or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

<u>Default Loan</u>:  As defined in Section 4.2(c).

<u>Demand Notice</u>:  As defined in Section 8.1.

<u>Disability</u>:  The inability of the Member to perform his duties and responsibilities to the Company, with or without reasonable accommodation, due to any physical or mental illness or incapacity, which condition has continued for a period of (a) one hundred twenty (120) consecutive days or (b) one hundred eighty (180) days (including weekends and holidays) in any

consecutive 365-day period, which determination shall be made by an independent physician selected by the Company and approved by the Effected Member (which approval shall not be unreasonably withheld, conditioned or delayed).

Distribution Percentages:  The percentage determined in accordance with the chart set forth on Exhibit A hereto with respect.

Distributions:  Any distributions of cash or other assets of the Company to the Members.

Effected Member:  As defined in Section 7.6.

Exercise Notice:  As defined in Section 8.1.

Fee Revenue:  All amounts received by the Company the source of which relates to (i) fees paid directly to the Company or (ii) fees paid to the Investment Entity or another Subsidiary for the Company or its Affiliate, in each case for providing services to the payer thereof.

Initiating Member:  The Member who has delivered a Demand Notice in accordance with Section 8.1.

Investment Entity:  AREH, and each other Person in which the Company holds an interest or serves as manager, from time to time.

Key Personnel:  Those Persons listed on Exhibit B hereto

Members:  Chassen and Simpson and any other Persons who are admitted to the Company as Members pursuant to Article 7.

Non-Contributing Member:  As defined in Section 4.2(c).

Permitted Transfers:  A (i) Transfer by a Member of all or any part of its Company Interest to any person or entity that is an Affiliate of such Member, and (ii) Transfers pursuant to the provisions of Article 8 of this Agreement.

Person:  An individual, trust, estate, partnership, joint venture, association, company, corporation or other entity.

Profit and Loss:  "Profit" or "Loss" means, for any fiscal year of the Company, the income or loss of the Company as determined in accordance with the accounting methods followed for federal income tax purposes (including any gains or losses recognized by the Company on the sale of the Property and any items required to be separately stated under Article 703 (a) of the Code).

Promote Distribution:  As defined in the AREH Operating Agreement.

Redemption Amount:  An amount equal to all Distributions that the Effected Member or Resigning Member, as applicable, would have been entitled received under Section 5.1(a) (i) if

all Cash Flow of the Company (excluding Promote Distributions) were then distributed and (ii) if all Cash Flow consisting of Promote Distributions from all assets of each Subsidiary as of the date death, Disability or Resignation of the applicable Member were distributed to the Resigning Member or Effected Member, or his estate, as applicable, if such Resigning Member or Effected Member were still a Member of the Company; provided, that for purposes of determining the Redemption Amount the Effected Member's or Resigning Member's Distribution Percentage shall be the percentage set forth on Exhibit A as of the date of such death or Resignation without giving effect to the proviso set forth on Exhibit A; provided, further that in the case of a Resignation of a Member, the amount payable to the Resigning Member pursuant to clause (ii) of this definition shall be 50% of the amount so determined.

Regulations:  The final, temporary and proposed Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Resignation:  With respect to a Member, either (i) the resignation of a Member from the Company or such Member's failure to provide substantially all of his business time for the benefit of the Company other than as a result of death of such Member or (ii) a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign.

Responding Member:  As defined in Section 8.1.

Restricted Period:  (i) Other than with respect to Key Parties, the twelve (12) month period following the applicable Member's Resignation or if such Member Resignation is due to a Cause Event, the twenty-four (24) month period following such Member's Resignation and (ii) with respect to Key Personnel, the twenty-four (24) month period following such Member's Resignation.

Second Option Period:  As defined in Section 8.2.

Subsidiary:  As defined in the AREH Operating Agreement.

Transfer:  Any sale, conveyance, transfer or assignment, or the entry into any agreement to sell, convey, transfer or assign, whether by law or otherwise, of, on, in or affecting (y) all or part of a Member's Company Interest (including any legal or beneficial direct or indirect interest therein), or (z) any direct or indirect interest in a Member (including any profit interest).

Unreturned Capital Contribution:  With respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 5.1(a)(i) and 5.1(b)(i).

    1.2   Other Terms.  Unless the context shall require otherwise:

        (a)   Words importing the singular number or plural number shall include the plural number and singular number respectively;

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
NYSCEF DOC. NO. 3

INDEX NO. 158055/2023

RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 7 of 27

(b)    Words importing the masculine gender shall include the feminine and neuter genders and vice versa;

(c)    Reference to "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation"; and

(d)    Reference in this Agreement to "herein", "hereof", "hereby" or "hereunder", or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the Exhibits.

(e)    Unless otherwise expressly provided, reference to a Section or Article number shall be deemed a reference to the Section or Article contained in this Agreement.

ARTICLE 2

<u>GENERAL PROVISIONS</u>

2.1    <u>Formation of the Company</u>.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Company Law and agree that the rights, duties and liabilities of the Members shall be as provided in the Company Law, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Articles of Organization with the Department of State of the State of New York is hereby ratified and confirmed in all respects..

2.2    <u>Further Action</u>.  The Members shall take any and all action, as may be required, from time to time, under the laws of the State of New York, to give effect to, and continue in good standing, the Company.

2.3    <u>Name of the Company</u>.  The name of the Company shall be JJ Arch LLC or such other name as the Members may from time to time determine.  The Members shall have the right to cause the Company to operate under one or more assumed names where required to comply with the laws of any states in which the Company is doing business.  The Members shall cause to be filed on behalf of the Company such company or assumed or fictitious name certificate or certificates or other similar documents as may from time to time be required by law for the formation and continuation of the Company as a limited liability company under the laws of New York applicable to limited liability company and the laws of such other states in which the Company is doing business regarding the qualification of foreign limited liability company.

2.4    <u>Business of the Company</u>.  The business of the Company shall be to:  (i) acquire, hold, and ultimately dispose of an interest in each Investment Entity, (ii) make, enter into, perform and carry out any arrangements, contracts or agreements consistent with the foregoing, and (iii) to do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.  The Company shall not engage in any business or activity not authorized by this Agreement.

2.5    <u>Place of Business</u>.  The Company's principal place of business is 1230 Park Avenue, 16E, New York, New York 10128 or such other place as the Members may, from time to time, determine.  Such office may be changed from time to time in accordance with the Company Law, as may be approved the Members.

2.6    <u>Duration of the Company</u>.  The Company shall commence upon the filing of an Articles of Organization for the Company in accordance with the Company Law, and shall continue until dissolved in accordance with Article 9 of this Agreement.

2.7    <u>Title to Company Property</u>.  A Member's Interest shall for all purposes be personal property.  All property owned by the Company, whether real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in that property.

ARTICLE III

<u>MEMBERS; MANAGEMENT</u>

3.1    <u>Management of the Company Prior to Fourth Anniversary</u>.

(a)    Prior to the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 3.1(b)), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, the Members shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.4.  Except as otherwise provided in this Agreement, prior to the fourth anniversary of the date hereof, Simpson shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through an Investment Entity, including, without limitation, the power to:

(i)    conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Company Law, with the Articles of Organization and this Agreement;

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    enter into any contract or endorsement in the name or for the account of the Company;

(iv)    employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, all on such terms and for such consideration as Simpson deems advisable;

(v)      bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi)      deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii)      cause the Company to carry such indemnification insurance as Simpson deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(viii)      take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of an Investment Entity.

(b)      Notwithstanding anything to the contrary contained in this Agreement, if prior to the fourth anniversary of the date hereof, Simpson desires to cause the Company or an Investment Entity to take any of the following decisions or actions (each a "Company Major Decision"), Simpson shall provide written notice thereof to Chassen with such additional information as Chassen may reasonably request.  Any Company Major Decision shall be undertaken only with the prior written consent of Chassen (and, for the avoidance of doubt, any action or decision that would constitute a Company Major Decision if made or taken by the Company shall be a Company Major Decision if made or taken by any Investment Entity, which consent shall be deemed granted by Chassen if Chassen fails to object to such action within fifteen (15) days of Simpson's written request therefor:

(i)      acquire any direct or indirect interests in any Person other than AREH;

(ii)      file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii)      sell any asset of the Company or any portion thereof other than any such asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property;

(iv)      merge, consolidate or other reorganize the Company with another Person;

(v)      borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi)      possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company by mortgage upon, or hypothecation or pledge of, all or part of an asset of the Company, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii)   enter into any lease for space;

(viii)   hire any employee, consultant or other personnel;

(ix)   engage in any business or activity not authorized by this Agreement;

(x)   enter into any agreement requiring the expenditure of more than $10,000 per annum;

(xi)   enter into any agreement with Simpson and/or any Affiliate thereof, on the one hand, and the Company on the other hand;

(xii)   enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii)   maintain reserves in excess of $20,000;

(xiv)   admit new or substitute Members to the Company;

(xv)   modify any material terms of the AREH Operating Agreement;

(xvi)   cause AREH to take any Major Decision (as defined in the AREH Operating Agreement).

3.2   <u>Management of the Company From and After Fourth Anniversary</u>.  From and after the fourth anniversary of this Agreement, the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by the Members.  Each Member shall have the right to cause the Company to take any action identified in Section 3.1(a).  All other actions on the part of without the Company shall require the consent of both Members.

3.3   <u>Services of the Members</u>.  Each Member shall devote substantially all of his business time and effort to the business of the Company, and shall perform his duties with the same degree of care he exercises with respect to his own assets.  Notwithstanding the foregoing, each Member and his Affiliates may at any time and from time to time engage in and possess interests in other business ventures of any and every type and description that is not competitive with the Company or an Investment Entity, and neither the Company nor any other Member shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures.

3.4   <u>Expenses</u>.  Each Member shall be entitled to be reimbursed for all business related expenses incurred by such Member in connection with his providing services hereunder and which are reimbursable pursuant to the Code.

3.5   <u>Guarantees</u>.  The Members acknowledge that in connection with any (i) financing or refinancing by AREH or another Investment Entity the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty,

environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, if a Guaranty is required and any Member is required to provide such Guaranty, agrees if a lender makes any written demand from time to time on a Guaranty made by a Member or its Affiliate, each Member shall pay, or reimburse the applicable guarantor, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the cause of the claim on such Guaranty is directly attributable to any action of the other Member or its Affiliate, and which action was not approved by the non-Guarantying Member. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

ARTICLE IV

CAPITAL CONTRIBUTIONS

4.1     Capital.  The capital of the Company shall consist of the amounts contributed to the Company pursuant to this Article IV.

4.2     Capital Contributions.  (a)  The Members have made Capital Contributions to the Company as reflected on the books and records of the Company.

(b)     If, at any time or from time to time, (i) Simpson determines that additional funds are required by the Company to meet its general and administrative expenses or (ii) the Company is required to make a capital contribution to an Investment Entity, Simpson shall deliver a written notice to Chassen (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call.  Each of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to either (i) if such Capital Call Notice is in connection with a requirement of the Company to make a capital contribution pursuant to Section 3.4 of the AREH Operating Agreement, their respective percentages of Promote Distributions paid to Members hereunder or (ii) in all other cases, 50% of Capital Call Amount.

(c)     If a Member (a "Non-Contributing Member") shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then the Member who made its required Capital Contribution (the "Contributing Member") shall have the right to contribute the amount of the Non-Contributing Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a

"Default Loan") to the Non-Contributing Member in an amount equal to the unfunded capital contribution.

(d)      Each Default Loan shall be deemed to constitute a loan made by the Contributing Member to the Non-Contributing Member in accordance with the terms hereof, immediately followed by a capital contribution by the Non-Contributing Member to the Company in the amount of such Default Loan.  Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the Contributing Member and shall constitute a debt owed by the Non-Contributing Member.  Any Default Loan shall bear interest at the rate of twelve percent (12%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Non-Contributing Member from any distributions due to Non-Contributing Member hereunder.  A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty.  Any such Default Loans shall be with full recourse to the Non-Contributing Member and shall be secured by the Non-Contributing Member's Company Interest including, without limitation, the Non-Contributing Member's right to distributions hereunder.  In furtherance thereof, upon the making of such Default Loan, the Non-Contributing Member hereby pledges, assigns and grants a security interest in its Company Interest to the Contributing Member and agrees to execute such documents and statements as are reasonably requested by the Contributing Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Non-Contributing Member prior to payment in full of all amounts (including interest) owed under the Default Loan.  All distributions that would have otherwise gone to the Non-Contributing Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full.  While any Default Loan is outstanding, the Company shall be obligated to pay directly to the Contributing Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Non-Contributing Member, and (y) any proceeds of the sale of the Non-Contributing Member's Company Interest.  Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Non-Contributing Member.

4.3      Capital Accounts.  (a) The Members shall cause to be kept for each Member a capital account ("Capital Account") which shall be computed from the date hereof and which shall initially be equal to the capital contribution of each Member on the date hereof and shall be determined and maintained in accordance with Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied, and Capital Accounts shall be maintained, in a manner consistent with such Regulations.

(b)      No interest shall be paid by the Company on any Capital Contribution.  A Member shall not be entitled to demand the return of, or to withdraw, any part of his Capital Contribution or any balance in his Capital Account, or to receive any distribution, except as provided for in this Agreement.  No Member shall be liable for the return of the Capital Contributions of any other Member and no Member shall have any obligation to restore the amount of any deficit in its Capital Account to the Company.

## ARTICLE 5

## DISTRIBUTIONS; ALLOCATION INCOME AND LOSSES

5.1     Distributions.

(a)     Cash Flow shall be accounted for on the books of the Company in accordance with the year such amounts were originally received by the real property assets or entities in which the Company owns an indirect interest and shall be distributed, earliest years first, within five (5) Business Days of receipt thereof by the Company to the Members as follows:

(i)     First to the Members in proportion to their respective Capital Contributions until their respective Unreturned Capital Contributions have been reduced to zero;

(ii)     To the Members in accordance with their respective Distribution Percentages with respect to the underlying asset from which the funds for such distribution are derived.

(b)     Fee Revenue shall be distributed within five (5) Business Days of receipt thereof by the Company to the Members as follows:  50% to Simpson and 50% to Chassen.

5.2     Allocations of Profit and Loss.  Profit and Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 9.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 9.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Profit or Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profit or Loss.

5.3     Tax Elections.  The Members shall determine whether the Company shall make any applicable tax elections, including an election in accordance with Section 754 of the Code to adjust the basis of the assets of the Company for Federal income tax purposes in the event of a distribution of Company property as described in Section 734 of the Code or a transfer by any Member of its Company Interest as described in Section 734 of the Code.

ARTICLE 6

BOOKS AND RECORDS; ACCOUNTS

6.1    <u>Books and Records</u>.    True and correct books of account with respect to the operations of the Company shall be kept at the principal place of business of the Company.  The Members shall be responsible for keeping the books of account.  The Company shall also maintain at its principal place of business the following records:  (a) a current list of the full name and last known business address of each Member set forth in alphabetical order, (b) a copy of the Articles of Organization and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed, (c) copies of the Company's Federal, state and local income tax returns and reports, if any, for the three most recent years and (d) copies of any then effective operating agreements and of any financial statements of the Company for the three most recent years.

Any Member shall have the right, at its own expense, to examine, or have its duly authorized representative examine, the books of account of the Company and such other information reasonably related to such Member's Company Interest, and the Members shall make them available at the office at which those books are maintained.

6.2    <u>Accounting Basis and Fiscal Year</u>.  The Company's books shall be kept on such basis as the Members shall determine.  The fiscal year of the Company shall be the calendar year.

6.3    <u>Tax Returns</u>.  (a)  The Members shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) any Federal, state or local tax returns required to be filed by the Company.  The Members shall use its reasonable efforts to furnish each Member within 90 days of the end of each fiscal year with such information as may be needed to enable each Member to file its Federal income tax return and any required state income tax return.  The Members shall cause the Company to pay, out of available cash flow and other assets of the Company, any taxes payable by the Company.  Except as otherwise set forth in this Agreement, all decisions regarding tax elections shall be made by the Members.

(b)    Each Member agrees to report, on his own income tax returns each year, each item of income, gain, loss, deduction and credit as reported by the Company to such Member on the Schedule K-1 (or other similar tax report) issued by the Company to such Member for such year.  Except as otherwise required by law, no Member shall take any tax reporting position that is inconsistent in any respect with any tax reporting positions taken by the Company or any entity in which the Company owns any equity interest, and, in the event of a breach by such Member of the provisions of this Section 6.3(b), shall be liable to the Company and the Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

6.4    <u>Tax Matters Member; Partnership Representative</u>.  Simpson is hereby designated the "Tax Matters Partner" pursuant to Section 6231 of the Code (and any comparable provision of applicable state and local tax laws).  All Members hereby consent to such designation and agree to take any further action as may be required to effectuate and maintain such designation and the Tax

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 15 of 27

Matter Partner is authorized to take such actions as may be required to effectuate and maintain such designation. Simpson is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Simpson shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Simpson, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 6.4 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

ARTICLE 7

ASSIGNABILITY OF INTERESTS;<br>ADDITIONAL MEMBERS

7.1    General Conditions. No Member shall Transfer all or any portion of its Company Interest, or any rights to receive any Distributions under this Agreement except (A) Permitted Transfers, (B) Transfers other than Permitted Transfers with the other Members' consent, to be exercised in such other Member's sole and absolute discretion, or (C) as required by Section 7.6 hereof. Notwithstanding the foregoing sentence, in no event shall a Member be permitted to Transfer all or any portion of its Company Interest if, in the opinion of counsel to the Company or, in the opinion of counsel to the non-transferring Members, which counsel is satisfactory to the transferring Member, in its reasonable discretion, the Transfer would (i) cause the termination or dissolution of the Company under the Company Law; (ii) require registration under the Securities Act of 1933, as amended, or under any other securities law or result in the violation of any applicable state securities laws; (iii) cause the Company or any Member to be subject to any additional material regulatory requirements; (iv) cause the Company to be taxed as a corporation under the Code; or (v) cause a default under any agreement, that was approved by the Members, to which the Company is a party including, without limitation, the AREH Operating Agreement.

7.2    Additional Member. A transferee of all or part of the Company Interest of a Member permitted under this Agreement shall be admitted to the Company as an additional Member and be listed as a Member on the books and records of the Company only if (i) the transferring Member gives such right to the transferee, (ii) except for Permitted Transfers, the Members consent to the admission of the transferee, which consent may be withheld in the Members' sole and absolute discretion, (iii) the transferee shall execute and deliver an agreement

reasonably satisfactory to and approved by the Members, agreeing to assume and to be bound by and to comply with all of the terms and conditions of this Agreement applicable to the Members, (iv) the transferee shall execute, and deliver all necessary certificates or other documents and perform such other acts as may be required under the Company Law or other applicable laws and regulations to effectuate the admission of the additional Member and to preserve the status and legal compliance of the Company as reasonably satisfactory to and approved by the Members and (v) the transferee shall pay all reasonable expenses of the Company and the Members connected with the admission including, but not limited to, reasonable legal and accounting fees and disbursements.

7.3 <u>Treatment</u>. Until compliance with the provisions of Section 7.2, the Company shall be entitled to treat the record owner of any Company Interest as the absolute owner of such Company Interest in all respects and shall incur no liability for distributions made to such owner.

7.4 <u>Other Transfers Void</u>. Any Transfer made in violation of the provisions of this Article 7 or of Article 8 shall be null and void and shall not bind the Company or any Member.

7.5 <u>Resignation of a Member</u>.

(a) Upon the Resignation of a Member, such Member's Company Interest shall be deemed automatically redeemed by the Company for the Redemption Amount, which shall be payable when and if the applicable distributions are received by the Company and such Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such Resignation occurs. In connection with any redemption pursuant to this Section 7.5, the Company shall have the right to require the redeemed Member to, and the redeemed Member shall, enter into agreements with the Company containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

(b) Each Member agrees that for the Restricted Period, such Member shall not, nor shall it permit any Person employed by, or associated or affiliated with, to (i) encourage, solicit, or inducing, or in any manner attempt to encourage, solicit, or induce, any Person employed by, as agent of, or a service provider to, the Company or an Investment Entity within the twelve (12) month period prior to the Closing to terminate (or, in the case of an agent or service provider, terminate or reduce) such Person's employment, agency or service, as the case may be, with the Company or its Subsidiary; (ii) hire any Person who was employed by, an agent of, or a service provider to, the Company or an Investment Entity, within the twelve (12) month period prior to the date of such hiring; or (iii) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce any customer, supplier, licensee or other business relation (or any direct or indirect subsidiary of any such customer, supplier, licensee or other business relation) of the Company or an Investment Entity to cease doing business with or reduce the amount of business conducted with (including by providing similar services or products to any such Person) the Company or an Investment Entity, or in any way negatively interfere with the relationship between any such customer, supplier, licensee or business relation and the Company

or an Investment Entity. Notwithstanding the foregoing, the restrictions set forth in this Section 7.5(b) shall in no way limit the applicable Member from (i) encouraging, soliciting, or inducing to become employed any individual who was such Member's personal assistant at the Company or employing such individual or (ii) except for Persons to whom the Company or an Investment Entity is required to offer all real estate investment opportunities, seeking capital from any Person who provides equity or debt financing to the Company or an Investment Entity. Without limiting the remedies available to the Company, the Members acknowledge that a breach of any of the covenants contained in this Section 7.5(b) may result in material irreparable injury to the Company for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of posting a bond or proving irreparable harm or injury as a result of such breach or threatened breach hereof, restraining the applicable Member from engaging in activities prohibited by this Section 7.5(b) or such other relief as may be required specifically to enforce any of the covenants in this Section 7.5(b).

7.6     Death or Disabilty of Member.

(a)     Upon the death or Disability of a Member (the "Effected Member"), such Member's Company Interest shall be automatically deemed transferred to the non-Effected Member for a purchase price equal to the Redemption Amount which shall be payable when and if the applicable distributions are received by the non-Effected Member with respect to the Company Interest acquired from the Effected Member. From and after the date of the death or Disability of the Effected Member, the Effected Member shall no longer be deemed a "Member" of the Company and shall not be entitled to any rights as a Member of the Company for any period from and after the date of such death but shall be allocated his proportionate share of Profit or Loss of the Company for the portion of the year in which such death occurs.

(b)     In connection with any sale pursuant to this Section 7.6, the non-Effected Member shall have the right to require the estate of the Effected Member to enter into agreements with the non-Effected Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that such Member's Company Interest is free and clear of all liens, claims or encumbrances.

ARTICLE 8

BUY/SELL RIGHTS

8.1     Right to Purchase.

(a)     From and after the second anniversary of the date hereof, in the event that the Members fail to approve any action requiring the consent of both Members including, without limitation, a Company Major Decision, and are unable to reach agreement as to an appropriate alternative course of action after not less than ten (10) Business Days of good faith negotiations to resolve their differences, either Chassen, on the one hand, or Simpson on the other hand (such Member being hereinafter referred to as the "Buy/Sell Initiating Member"),

shall have the right to give written notice (the "Buy/Sell Demand Notice") to the other Member (such other Member being hereinafter referred to as the "Buy/Sell Responding Member"), of the Buy/Sell Initiating Member's intent to rely on this Article 8 and to purchase for cash all, but not less than all, of the Company Interests owned by the Buy/Sell Responding Member, whereupon the provisions set forth in this Article 8 shall apply. In the event that both Simpson and Simpson are deemed to have delivered a Buy/Sell Demand Notice, the Member who shall be deemed to have first delivered the Buy/Sell Demand Notice pursuant to Section 11.1 hereof after the ten (10) Business Day good faith negotiation period set forth herein shall be deemed the Buy/Sell Initiating Member or if both Simpson and Chassen shall be deemed to have delivered a Buy/Sell Demand Notice hereunder on the same date, the Member whose Buy/Sell Demand Notice hereunder sets forth the highest price shall be deemed the Buy/Sell Initiating Member.

(b)     The Buy/Sell Demand Notice shall set forth the cash purchase price at which the Buy/Sell Initiating Member would be willing to purchase (or to cause its designee to purchase) an undivided one hundred percent (100%) interest in the Company free and clear of all liabilities and assuming that no Capital Contributions are made and that all cash flow of the Company is distributed between the date of the Buy/Sell Demand Notice and the date on which the Company Interests are sold pursuant to this Article 8, together with a calculation of such purchase price.

(c)     The Buy/Sell Responding Member shall have the option, exercisable by giving written notice (the "Buy/Sell Exercise Notice") to the Buy/Sell Initiating Member within ten (10) Business Days after receipt of the Buy/Sell Demand Notice, to agree to either (i) sell to the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2 or (ii) purchase from the Buy/Sell Initiating Member for cash all, but not less than all, of its Company Interests at the price and on the terms and conditions set forth in Section 8.2.

8.2     Procedure for Purchase of Buy/Sell Sale Interests.

(a)     As used in this Section 8.2 the following terms shall have the following meanings:

(i)     "Buy/Sell Deposit" shall mean an amount equal to 10% of the Buy/Sell Sale Interest Purchase Price, which deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.

(ii)     "Buy/Sell Option Period" shall mean the time period during which the Buy/Sell Responding Member shall have the right to elect either to purchase the Company Interests of the Buy/Sell Initiating Member or sell its entire Company Interests to the Buy/Sell Initiating Member pursuant to Section 8.1(c) above.

(iii)     "Buy/Sell Purchasing Member" shall mean either (x) the Buy/Sell Initiating Member (or its designee) if the Buy/Sell Responding Member shall have elected in its Buy/Sell Exercise Notice not to purchase the Company Interests of the Buy/Sell Initiating Member, or (y) the Buy/Sell Responding Member (or its designee) if it shall have indicated in its

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 19 of 27

Buy/Sell Exercise Notice its intent to purchase the Company Interests of the Buy/Sell Initiating Member.

(iv)    "Buy/Sell Sale Interest" shall mean the Company Interests of the Buy/Sell Selling Member.

(v)    "Buy/Sell Sale Interest Purchase Price" shall mean an amount equal to the amount which the Buy/Sell Selling Member would have been entitled to receive upon dissolution of the Company pursuant to the terms of this Agreement if the Company had sold all of its assets for cash to a third party at the price set forth in the Buy/Sell Demand Notice and had utilized such cash first to satisfy all debt obligations, paid all expenses, transfer taxes, costs and fees relating to such sale,  and then liquidated the Company.

(vi)    "Buy/Sell Selling Member" shall mean the Member who is not the Buy/Sell Purchasing Member.

(b)    Within two (2) Business Days following the Buy/Sell Option Period, the Buy/Sell Purchasing Member shall deposit into escrow, with an escrow agent (the "Buy/Sell Escrow Agent") selected by the Buy/Sell Purchasing Member, but not an Affiliate of the Buy/Sell Purchasing Member, and reasonably acceptable to the Buy/Sell Selling Member, the Buy/Sell Deposit, which Buy/Sell Deposit shall be applied to the Buy/Sell Sale Interest Price at the Buy/Sell Closing.  The Buy/Sell Deposit shall be held by the Buy/Sell Escrow Agent in accordance with the terms hereof.  Upon delivery of the Buy/Sell Deposit to the Buy/Sell Escrow Agent, the Buy/Sell Purchasing Member shall have the sole right, without the need for consent from any other Member, to cause the Company to take the action, or refrain from taking the action, which was the cause of the Buy/Sell Demand Notice.

(c)    Within thirty (30) Business Days following the date on which the Buy/Sell Option Period shall have expired, the Buy/Sell Purchasing Member shall purchase from the Buy/Sell Selling Member (such purchase and sale is referred to herein as the "Buy/Sell Closing"), and the Buy/Sell Selling Member shall sell to the Buy/Sell Purchasing Member, the Buy/Sell Sale Interest at the Buy/Sell Sale Interest Purchase Price.  In determining this amount it shall be assumed that: (i) no prepayment premium or make whole amount is owing to any lender, (ii) no reserves will be maintained, (iii) there will be no brokerage fees, transfer taxes or other transaction costs in connection with such liquidation, and (iv) the proceeds from such sale and liquidation would be distributed in accordance with Section 5.1 hereof.  Upon the Buy/Sell Closing, the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member and applied to the Buy/Sell Sale Interest Purchase Price.

(d)    In connection with any sale pursuant to this Section 8.2, the Buy/Sell Purchasing Member shall have the right to require the Buy/Sell Selling Member to enter into agreements with the Buy/Sell Purchasing Member containing terms and conditions relating to the sale that are customary for transactions of this type, including, without limitation, a representation and warranty that the Buy/Sell Selling Member's Company Interests are free and clear of all liens, claims or encumbrances and an indemnity from the Buy/Sell Selling Member to the Buy/Sell Purchasing Member for claims arising out of events which occur prior to the Buy/Sell Closing and an indemnity from the Company to the Buy/Sell Selling Member for

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
NYSCEF DOC. NO. 3
INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 20 of 27

claims arising on or after the Buy/Sell Closing. Each Member shall pay any transfer tax imposed on such Member pursuant to applicable law and there shall be such prorations at the Buy/Sell Closing as are customary in such transactions, including without limitation for such items as real estate taxes, rents, security deposits, service contracts and assessments.

(e)    From the date of the Buy/Sell Demand Notice until the consummation of the Buy/Sell Closing, the Company shall continue to be operated in the ordinary course, as if such Buy/Sell Closing were not going to occur, the Members shall continue to have all power and authority granted in this Agreement (including the power and obligation to make distributions), and the Members shall exercise their power and authority in good faith and without regard to the fact that such Buy/Sell Closing may occur; provided, that: (i) any and all Distributions to the Buy/Sell Selling Member derived solely from proceeds of a Capital Event shall be credited against and reduce the Buy/Sell Sale Interest Purchase Price payable to the Buy/Sell Selling Member; and (ii) except as provided in Section 8.2(b), the Company shall not, nor shall it permit any Subsidiary to, without the consent of the Members enter into any contracts or agreements, or otherwise agree, to sell or otherwise dispose of any Company assets, except that the Company and each of its Subsidiaries shall be authorized to consummate any transactions that were the subject of binding contractual obligations entered into prior to the delivery of the Buy/Sell Demand Notice.

(f)    If the Buy/Sell Purchasing Member shall default in its obligation to:

(i)    timely make the Buy/Sell Deposit as required in Section 8.2(b), then upon written notice to the Buy/Sell Purchasing Member the Buy/Sell Selling Member shall have the right to terminate the Buy/Sell Purchasing Member's right to acquire the applicable Company Interests pursuant thereto and either (x) recover an award or judgment against the Buy/Sell Purchasing Member in the amount of such required Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment or (y) have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

(ii)    consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from Buy/Sell Selling Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Selling Member, then (x) the Buy/Sell Deposit shall be paid to the Buy/Sell Selling Member as liquidated damages (the Members hereby acknowledging and agreeing that it is impossible to more precisely estimate the damages to be suffered by the Buy/Sell Selling Member upon such default and that the Buy/Sell Deposit that may be received by the Buy/Sell Selling Member is not intended as a penalty), and (y) the Buy/Sell Selling Member shall have the right to acquire from the Buy/Sell Purchasing Member its Company Interest pursuant to this Section 8.2 at a purchase price equal to the Buy/Sell Sale Interest Purchase Price as if the Buy/Sell Purchasing Member was the Buy/Sell Selling Member less ten percent (10%).

The Buy/Sell Selling Member shall be deemed to have exercised its rights under clause (i)(y) or clause (ii)(y) of this Section 8.2(f) if the Buy/Sell Selling Member shall have delivered to the

Buy/Sell Purchasing Member a written notice of its intent to acquire the Buy/Sell Purchasing Member's Company Interest within ten (10) Business Days (the "Second Option Period") of the expiration of the two (2) Business Day period within which to make the Buy/Sell Deposit or the thirty (30) Business Day time period within which the Buy/Sell Purchasing Member had the right to acquire the Buy/Sell Sale Interests, as applicable.  Upon the exercise by the Buy/Sell Selling Member of its rights under this Section 8.2(f), for purposes of this Section 8.2, the Buy/Sell Selling Member shall be deemed the Buy/Sell Purchasing Member, the Buy/Sell Purchasing Member shall be deemed the Buy/Sell Selling Member and the Option Period shall be deemed to have expired on the expiration of the Second Option Period.

(g)    If the Buy/Sell Selling Member shall default in its obligation to consummate the acquisition of the Buy/Sell Sale Interest within the prescribed time period, such default shall continue for three (3) Business Days after receipt of written notice thereof from the Buy/Sell Purchasing Member and such default is not caused, in whole or in part, by the actions or inactions of the Buy/Sell Purchasing Member, then the Buy/Sell Purchasing Member shall have the right upon written notice to the Buy/Sell Selling Member to either (i) seek specific performance of the Buy/Sell Selling Member's obligations, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment; it being agreed by the Buy/Sell Selling Member and the Buy/Sell Purchasing Member that the remedy at law for breach of the obligations of the Buy/Sell Selling Member set forth in Section 8.2(c) is inadequate in view of (A) the complexities and uncertainties in measuring actual damages to be sustained by the Buy/Sell Purchasing Member, and (B) the uniqueness of the Company business and the Members' relationships, or (ii) upon written notice to the Buy/Sell Selling Member, demand and receive a return of the Buy/Sell Deposit previously deposited with the Buy/Sell Escrow Agent together with reimbursement of all out-of-pocket costs and expenses incurred by the Buy/Sell Purchasing Member in connection with the exercise of the buy/sell right set forth in this Article 8 and the pursuit of the acquisition of the applicable Company Interests with respect thereto, and recover an award or judgment against the Buy/Sell Selling Member in the amount of the Buy/Sell Deposit, together with its reasonable attorneys' fees and costs incurred in obtaining such award or judgment, in which event, the Buy/Sell Selling Member's default hereunder shall be deemed waived and the Buy/Sell Demand Notice to which such default relates shall be void *ab initio* (such that any further exercise of the buy/sell right set forth in this Article 8 shall require compliance with this Article 8).

8.3    Release of Buy/Sell Selling Member.  The Buy/Sell Purchasing Member shall exercise commercially reasonable efforts to obtain a release of the Buy/Sell Selling Member and the Buy/Sell Selling Member's Affiliates from any personal liability with respect to all Company obligations arising or accruing from and after the Buy/Sell Closing, if any, and all other obligations related thereto including any guarantees with respect thereto.  If the Buy/Sell Purchasing Member is unable to obtain any such releases, then (i) from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, the Buy/Sell Purchasing Member and the Company, jointly and severally, shall indemnify and hold harmless the Buy/Sell Selling Member from any and all claims or liabilities arising from such unreleased obligations and/or guarantees arising or accruing from and after such closing, if any, except to the extent caused by the Buy/Sell Selling Member, and (ii) with respect to any guaranty provided by any Affiliate of the Buy/Sell Selling Member under any loan document or other agreement with respect to any indebtedness of the Company or any subsidiary that guarantees any obligation for which any

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023

NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 22 of 27

Affiliate of the Buy/Sell Purchasing Member is jointly and severally liable as a guarantor, then from and after the closing of the sale of the Buy/Sell Selling Member's Company Interest, such Affiliate of the Buy/Sell Purchasing Member shall indemnify and hold harmless such Affiliate of the Buy/Sell Selling Member from any personal liability with respect to such guaranteed obligation arising or accruing from and after such closing, if any, except to the extent such personal liability is caused by such Affiliate of the Buy/Sell Selling Member.

ARTICLE 9

DISSOLUTION AND TERMINATION

9.1    <u>Events of Dissolution</u>.  The Company shall be dissolved upon the happening of any of the following events:

(a)    The disposition of all or substantially all of the assets of the Company;

(b)    The unanimous vote by the Members; or

(c)    The happening of any other event causing the dissolution of the Company under the laws of New York.

Dissolution of the Company shall be effective on the day the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles of Organization of the Company has been canceled and the assets of the Company have been distributed as provided herein.

9.2    <u>Limited Return of Capital Contributions Upon Dissolution</u>.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution, and shall have no recourse therefor (upon dissolution or otherwise) against any Member.  Notwithstanding the dissolution of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement until termination of the Company, as provided in this Agreement.  Upon dissolution of the Company, the Members or a liquidator (who may be a Member) appointed by the Members, shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this agreement and cause the cancellation of the Company's Articles of Organization.

9.3    <u>Distributions Upon Liquidation</u>.    (a)    Upon dissolution of the Company, the Members or the liquidator appointed pursuant to Section 9.2, shall liquidate the assets of the Company as promptly as is consistent with obtaining the fair value thereof, and apply and distribute the proceeds thereof:

(i)    First, to creditors in the order of priority provided by law;

(ii)    Second, to the establishment of any reserves for contingencies which the Members (or the liquidator) may consider necessary; and

(iii)    The balance of the proceeds shall be distributed to the Members in accordance with Section 5.1 hereof.

(b)    Notwithstanding the foregoing, in the event the Members (or liquidator) shall determine that an immediate sale of part or all of the Company assets would cause undue loss to the Members, the Members (or liquidator), in order to avoid such loss, may, after giving notice to all the Members, to the extent not then prohibited by the limited liability company law of any jurisdiction in which the Company is then formed or qualified and applicable in the circumstances, defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations.

(c)    After the proceeds of the liquidation of the assets of the Company have been distributed (which shall occur as soon as practical), the Members (or liquidator) shall cause the Articles of Organization of the Company to be canceled.

9.4    <u>Final Accounting</u>.  Upon the dissolution of the Company a proper accounting shall be made by the Company's independent public accountants from the date of the last previous accounting to the date of dissolution.

ARTICLE 10

<u>LIABILITY, EXCULPATION
AND INDEMNIFICATION</u>

10.1    <u>Liability</u>.  (a) Except as otherwise provided by the Company Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)    Except as otherwise expressly required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profit of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

10.2    <u>Indemnification</u>.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; <u>provided</u>, <u>however</u>, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

10.3 <u>Expenses</u>. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof.

## ARTICLE 11

## <u>MISCELLANEOUS</u>

11.1 <u>Notices</u>. Any notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand and shall be deemed to have been given (i) when personally delivered with signed delivery receipt obtained, (ii) when transmitted by electronic mail, or (iii) three Business Days after such notice has been deposited in the United States first class mail if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed to the Members at the addresses set forth in the preamble hereto or at such other address as such Member may notify the other Members and the Company pursuant to the terms of this Section 11.1.

11.2 <u>Successors and Assigns</u>. Subject to the restrictions on Transfer set forth in this Agreement, this Agreement, and each provision of this Agreement, shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and permitted assigns, and each successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

11.3 <u>Amendments</u>. This Agreement may be amended only by a written document approved by and duly executed by the Members, subject to the condition that such amendment shall not increase the Capital Contribution required from any Member or adversely affect any Distribution or allocation to any Member without such Member's written consent. Notwithstanding the foregoing, the written consent of all Members shall be required to any amendment which would (a) allow the Members to take part in the control of Company's business or otherwise modify their limited liability, (b) extend the term of this Agreement, (c) in the opinion of counsel to the Company, adversely affect the status of the Company as a partnership for Federal income tax purposes, or (d) amend this Section 11.3.

11.4 <u>Partition</u>. No Member or any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have any Company assets partitioned, and each Member, on behalf of itself, its successors, representatives, heirs and assigns, hereby waives any such right. It is the intention of the Members that during the term of this Agreement the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the rights of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Company shall be subject to the limitations and restrictions of this Agreement.

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 25 of 27

11.5    <u>No Waiver</u>.  The failure of any Member to insist upon strict performance of a covenant under this Agreement or of any obligation under this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of that Member's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation under this Agreement.  No waiver or consent shall be effective unless in writing.

11.6    <u>Entire Agreement</u>.  This Agreement constitutes the full and complete agreement of the parties to this Agreement with respect to the subject matter of this Agreement.

11.7    <u>Captions</u>.  The titles or captions of Articles or Sections contained in this Agreement are inserted only as a matter of convenience and for reference, are not a part of this Agreement, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

11.8    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all Members have not signed the same counterpart.

11.9    <u>Separability</u>.  In case any of the provisions contained in this Agreement or any application of any of those provisions shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and other applications of those provisions shall not in any way be affected or impaired thereby.

11.10    <u>Gender</u>.  Words used herein, regardless of the gender specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, as the context shall require.

11.11    <u>Applicable Law</u>.  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and interpreted, construed and enforced in accordance with the law of the State of New York applicable to agreements made and to be performed in the State of New York.

[remainder of page left intentionally blank]

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb   Doc 45-22   Filed 07/24/25   Entered 07/24/25 15:32:23   Exhibit
Pg 26 of 27

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

_____
Jared Chassen

_____
Jeffrey Simpson

FILED: NEW YORK COUNTY CLERK 08/15/2023 11:17 AM
NYSCEF DOC. NO. 3

INDEX NO. 158055/2023
RECEIVED NYSCEF: 08/15/2023

25-10437-lgb    Doc 45-22    Filed 07/24/25    Entered 07/24/25 15:32:23    Exhibit
Pg 27 of 27

Exhibit A

Distribution Percentages

| Date of Receipt by Revenue From which Distribution is Made | Threshold Investment Amount | Simpson | Chassen |
|---|---|---|---|
| Prior to 12-31-18 | $5,000,0000 | 66.6667% | 33.3333% |
| 1-1-19 to 12-31-19 | $10,000,000 | 62.5025% | 37.4975% |
| 1-1-20 to 12-31-20 | $15,000,000 | 58.3350% | 41.6650% |
| 1-1-21 to 12-31-21 | $20,000,000 | 54.1675% | 45.8325% |
| After 12-21-21 | none | 50.0000% | 50.0000% |

; provided, however, except as set forth in the next paragraph, such distribution percentages shall not change for the applicable period unless the aggregate Company Investments equals or exceeds the applicable Threshold Investment Amount. For example, if as of December 31, 2018 the total Company Investments is less than $5,000,000 and at December 31, 2019 the total Company Investment Amount is $10,000,000 or more, the percentages for January 1, 2019 through December 31, 2019 will remain at 66.6667% and 33.3333% and the percentages for January 1, 2020 through December 31, 2020 will change to 58.3350% and 41.6650%. That is, the Threshold Investment Amount is a cumulative test with a catch up.

With respect to Cash Flow derived from Promote Distributions, if such Promote Distributions is received from an asset held by the applicable Subsidiary for at least 2 full years, the Distribution Percentages of Simpson and Chassen as to such Promote Distributions shall each be 50% regardless of what the Distribution Percentage would otherwise be in the above chart.

"Company Investment Amount" means the aggregate capital contributions made to the Company, AREH and the other Investment Entities.